POSNER, Circuit Judge.
 

 This farm bankruptcy case raises questions of interpretation under 11 U.S.C. § 522, the statute that governs the bankrupt’s right to take some of his property out of the bankrupt estate and thus keep it after he is discharged from bankruptcy.
 

 Mr. and Mrs. Patterson were engaged in dairy farming in Wisconsin. They rented rather than owned the farmland and buildings (including the house they lived in), but owned the cows and farm equipment, primarily a tractor. Like many midwestern farmers they fell on hard times in the 1980s, and in October 1983 they filed a petition for protection under Chapter 11 of the Bankruptcy Code, which authorizes reorganization under the protection of the bankruptcy court. In December 1985, having decided to quit farming because they couldn’t afford feed for their cows, they converted their petition into one for liquidation under Chapter 7. See 11 U.S.C. § 348. They continued to live on the farm they had rented, and a neighboring farmer gave Mr. Patterson a part-time job as a dairy hand.
 

 
 *1141
 
 A month after the conversion, the Patter-sons’ cows and tractor were auctioned off. The auction netted $24,600, of which 51 cows accounted for $20,800 and the tractor for the rest. Among their debts, the Pat-tersons owed the Abbotsford State Bank some $82,000. The bank had a non-purchase-money, nonpossessory lien in the cows and tractor, which it wanted to enforce against the proceeds of the auction. However, the Pattersons’ petition to convert their bankruptcy from Chapter 11 to Chapter 7 had asked the bankruptcy judge to exempt all property to which they might be entitled by virtue of section 522(d), and now they moved to set aside the bank’s lien to the extent of $17,300 of the proceeds of the auction. The judge granted the petition and motion, thereby entitling the Pat-tersons to retain this money free of the bank’s claim.
 

 The district judge affirmed this ruling except with respect to the cows, which he thought were not tools of the debtors’ trade. 64 B.R. 120 (W.D.Wis.1986). The bank has appealed, and the Pattersons have cross-appealed on the matter of the cows. The bank raises a procedural point that is insubstantial, and a constitutional point that was forfeited by not being argued to the district judge (or to the bankruptcy judge, for that matter).
 

 The substantial issues involve the interpretation of 11 U.S.C. §§ 522(d) and (f). Subsection (d), when read in conjunction with (b)(1), allows the debtor to exempt from bankruptcy (i.e., keep out of the hands of the trustee in bankruptcy), the following property:
 

 (1) The debtor’s aggregate interest, not to exceed $7,500 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence, in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial plot for the debtor or a dependent of the debtor.
 

 (2) The debtor’s interest, not to exceed $1,200 in value, in one motor vehicle.
 

 (3) The debtor’s interest, not to exceed $200 in value in any particular item, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.
 

 (4) The debtor’s aggregate interest, not to exceed $500 in value, in jewelry held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.
 

 (5) The debtor’s aggregate interest, not to exceed in value $400 plus any unused amount of the exemption provided under paragraph (1) of this subsection, in any property.
 

 (6) The debtor’s aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor.
 

 (7) Any unmatured life insurance contract owned by the debtor, other than a credit life insurance contract.
 

 (8) The debtor’s aggregate interest, not to exceed in value $4,000 less any amount of property of the estate transferred in the manner specified in section 542(d) of this title, in any accrued dividend or interest under, or loan value of, any unmatured life insurance contract owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent.
 

 (9) Professionally prescribed health aids for the debtor or a dependent of the debtor....
 

 Standing alone, subsection (d) would not affect the right of a secured lender, such as the Abbotsford State Bank, to enforce its lien, but subsection (d) does not stand alone. It is complemented by subsection (f), which provides:
 

 Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
 

 (1) a judicial lien; or
 

 
 *1142
 
 (2) a nonpossessory, nonpurchase-mon-ey security interest in any—
 

 (A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
 

 (B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
 

 (C) professionally prescribed health aids for the debtor or a dependent of the debtor.
 

 The Pattersons seek to use the statute as follows. They start with the premise that both the tractor and the cows are “tools of the trade.” They go to section 522(d)(6), which exempts the debtor’s interest “in any implements, professional books, or tools, of the trade of the debtor,” though only up to $750. (Congress recently lowered some of the exemption ceilings discussed in this opinion, by amendment to the Bankruptcy Code, but the amendment is not applicable to this proceeding.) Since both Pattersons are debtors, and they owned the cows and tractor jointly, each claims the $750 exemption, for a total of $1,500. The Pattersons then go to subsection (d)(5), which exempts the debtor’s “interest, not to exceed in value $400 plus any unused amount of the exemption provided” by subsection (d)(1), “in any property.” This is the so called “wild card” exemption, because it isn’t tied to a particular form of property. Right off the bat it gives the Pattersons (they contend) another $800. They then go to subsection (d)(1), to which (d)(5) refers. Since the Pattersons did not own their residence, the unused amount of their (d)(1) exemption is $15,000 for the two of them together, and they want to add that to the $800, to produce a total wild-card exemption of $15,800. This amount, when added to the tools of the trade exemption, would yield the grand total of exemptions that they seek of $17,300. Finally, they want to use the lien-avoidance provision of the statute (section 522(f)) to avoid the bank’s lien in the proceeds of the auction, and thereby keep the full $17,300 out of the hands of both their secured and unsecured creditors, the latter being represented by the trustee in bankruptcy.
 

 As the bank and the Wisconsin Bankers Association, which filed a brief as
 
 amicus curiae,
 
 point out, the Pattersons’ claim has far-reaching implications for farm credit. If accepted it would allow the farmer who does not own his own home to keep a substantial amount of his farm assets from being used to satisfy his debts, even though he had pledged the assets as security for those debts. We add that while winning this case might be a boon to the Pattersons (but might not, in the long run, for it might make it harder for them to convince another bank to finance their return to farming), it would not help farmers as a group; it would raise the cost of credit to them. Because a person who fits the Bankruptcy Code’s definition of “farmer” can’t be forced into bankruptcy, see
 
 In re Wagner,
 
 808 F.2d 542 (7th Cir.1986), but can declare bankruptcy if he wants, he controls the timing of bankruptcy and can use it to take maximum advantage of the exemptions. Knowing this makes lenders even more reluctant to lend money to farmers at interest rates that farmers can afford to pay. A law that grants farmers advantages in bankruptcy helps some farmers when the law is passed but may hurt more of them by making farm credit more expensive in the future. (Of course, neither this point nor section 522 itself is limited to farmers.) This point does not entitle us to construe the exemption and lien-avoidance provisions of the Bankruptcy Code narrowly, but, by showing that a broad construction might hurt the very class sought to be benefited, it argues against construing the provisions broadly, without evidence — of which we can find none — that Congress wanted us to do so.
 

 The bank’s first two arguments against the district court’s decision are closely related. The first is that since the Patter-sons were about to quit dairy farming when they filed their petition to convert the bankruptcy from Chapter 11 (reorganization) to Chapter 7 (liquidation), and since
 
 *1143
 
 they had indeed quit farming by the time they filed their motion to avoid the bank’s lien, they cannot use the tools of the trade exemption at all. The second argument is that the exemption cannot be used for proceeds, as distinct from the tools themselves. The arguments are linked because once the debtor leaves his trade he is likely to sell his tools and be left with the proceeds.
 

 In making its first argument the bank assumes that the relevant date for determining whether the Pattersons were in or out of farming was the date on which they filed their petition to avoid the lien. This was not only after they had converted their Chapter 11 proceeding, which they had filed in 1983, into a Chapter 7 liquidation, but after they had auctioned off their cows and equipment and thereby ceased to operate a dairy farm. If instead the date of the original petition for bankruptcy is the relevant one, then the bank’s first argument clearly has no merit, because the Patter-sons were still farming in 1983 — that’s why they initially attempted reorganization rather than liquidation.
 

 The cases say that the relevant date for determining whether the debtor is still in the trade for purposes of the tools of the trade exemption is the date on which the bankruptcy petition is filed. See
 
 Flick v. United States,
 
 47 B.R. 440, 443 (W.D.Pa.1985);
 
 In re Brzezinski,
 
 65 B.R. 336, 339 (Bankr.W.D.Wis.1985);
 
 In re Richardson,
 
 47 B.R. 113, 118-19 (Bankr.W.D.Wis.1985);
 
 In re Johnson,
 
 19 B.R. 371, 374-75 (Bankr.D.Kan.1982). Whether this is a considered and authoritative conclusion may be doubted, however. The cases build on two much earlier cases,
 
 White v. Stump,
 
 266 U.S. 310, 312-14, 45 S.Ct. 103, 103-04, 69 L.Ed.2d 301 (1924), and
 
 Mansell v. Carroll,
 
 379 F.2d 682, 684 (10th Cir.1967), both of which involved the homestead exemption rather than the tools of the trade exemption; there is a relevant difference between them, as we are about to see. Moreover, the foundations of
 
 White v. Stump
 
 were removed by the change that the 1978 revision of the bankruptcy law made in the definition of the bankrupt’s estate. It used to be that exempt property was not a part of the estate when the bankruptcy petition was filed; now it is, and the bankrupt must take steps to remove exempt property from the estate. See 11 U.S.C. §§
 
 522(l),
 
 541; S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5868;
 
 Shirkey v. Leake,
 
 715 F.2d 859, 863 (4th Cir.1983);
 
 In re Smith,
 
 640 F.2d 888, 891-92 (7th Cir.1981). The Supreme Court in
 
 White
 
 had reasoned that since the debtor’s right to an exemption was determined at the date of filing the bankruptcy petition, subsequent events should not affect the exemption, and this reasoning is inapplicable to cases under the 1978 statute.
 

 The date of asking for the exemption, rather than the date of the petition for bankruptcy, might seem the relevant date for determining the availability of the tools of the trade exemption, given the purpose of that exemption, which is not to confer a windfall on the debtor or (as in the case of the homestead exemption) to lessen the blow of bankruptcy on the bankrupt and his family, but to enable him to remain in his trade after bankruptcy. We have difficulty understanding how someone who has abandoned his trade at the time he asks the bankruptcy court to exempt the tools he had used, but now has sold, can be thought entitled to the exemption. We do not suppose that if the Pattersons had used the proceeds of the auction to buy a pleasure boat, the boat would be beyond the reach of the Pattersons’ creditors by virtue of the tools of the trade exemption.
 

 In re Williamson,
 
 804 F.2d 1355, 1358-62 (5th Cir.1986), it is true, held that when (as in this case, too) a Chapter 11 proceeding is converted into a Chapter 7 proceeding, the relevant date for determining the debtor’s entitlement to exemptions is the date of the original filing rather than the date of conversion.
 
 (In re Lindberg,
 
 735 F.2d 1087 (8th Cir.1984), looks the other way, but is distinguishable.) But
 
 Williamson
 
 dealt with exemptions other than under section 522(d); and with regard to these other exemptions, the relevant statute, section 522(b)(2)(A), appears — by referring to federal, state, or local law “that is applica
 
 *1144
 
 ble on the date of the filing of the petition” —to make the date of original filing controlling. Such language does not appear in section 522(b)(1), the counterpart provision for exemptions created by subsection (d). We add that we do not consider the date of conversion the relevant one either, in a case involving the tools of the trade exemption in section 522(d). A debtor might convert because he could not make a go of his existing business, not because he wanted to abandon his trade. The point to be stressed is the limited purpose of the exemption: to enable the debtor to continue in his trade. If when he asks for the exemption he is out of the trade, allowing the exemption will not advance the statutory purpose.
 

 But this reasoning is not conclusive either. Subsection (I) of section 522 requires the debtor to file a list of the property that he claims as exempt under subsection (b), including (b)(1), and the implementing rule requires that the list be filed with or shortly after the petition for bankruptcy. See Bankruptcy Rule 1007(e). In addition, the value of exempt property is determined as of the date of the filing of the petition for bankruptcy, see 11 U.S.C. § 522(a)(2), not the date when the exemption is sought. Furthermore, there is no provision in the statute or rules for a petition for exemption as such; nor was one filed here.
 

 Here is another wrinkle. The original petition for bankruptcy did not list any exempt property; it was first listed in the petition to convert the proceeding from Chapter 11 to Chapter 7. The bank does not argue that this omission worked a forfeiture, as there may be little purpose in listing exempt property in a Chapter 11 petition, which contemplates that the debt- or will remain in possession of the assets of the bankrupt estate, exempt and nonexempt. But the Pattersons’ delay in claiming exemptions does undermine (to what degree we need not determine in this case) the argument that entitlement to exemptions is always to be determined by the situation as it existed when the original petition for bankruptcy was filed. -
 

 And, indeed, whether for this or other reasons, the Pattersons concede that the relevant date for determining whether the tools of the trade exemption is applicable is the date of their petition to convert the proceeding from Chapter 11 to Chapter 7 rather than the date of the original petition, even though, as we have said, conversion as such changes nothing — except that here the petition to convert was the first document in which exemptions were claimed. But the Pattersons’ concession cannot, in the end, help the bank. First of all, when the petition for conversion was filed the Pattersons were still operating the dairy farm; it was later that they auctioned off the cows and equipment and quit operating the farm. The bank wants to shove off the relevant date to when the motion to avoid the bank’s lien was filed, and we do not understand the reasoning behind this approach. Second, Mr. Patterson, at least, remained in farming, albeit as a part-time farmhand rather than an independent farmer, after the petition for conversion was filed. Farming is both a business and an occupation, and it is the second meaning that is relevant to the tools of the trade exemption. The record shows that Mr. Patterson continues to own his rakes and other hand tools — tools of the trade of farming in an uncontested sense — and to use them in his part-time job as a dairy hand.
 

 Third, even if it is the business rather than occupation of farming that counts, the bankruptcy judge found that the Patter-sons’ business was still farming, even after they had quit operating the dairy farm, because they testified that they intended to resume their business of dairy farming as soon as conditions brightened. This was a factual finding, which we are bound by unless it was clearly erroneous. If it could be interpreted to mean that the Pattersons had a serious, or as we just said a substantial, intention of going back into dairy farming, and not merely a daydream, that would be enough to preserve the exemption. By the same token, perhaps, if they had a fixed intention to quit farming, as maybe they did when they converted their Chapter 11 proceeding to a Chapter 7 pro
 
 *1145
 
 ceeding, they might be considered no longer to be farmers. Then the first point would cease to count for them. The analogy to determinations of domicile is evident, see, e.g.,
 
 Freeman v. Northwest Acceptance Corp.,
 
 754 F.2d
 
 553, 555-56
 
 (5th Cir.1985), but need not be pursued.
 

 But the bankruptcy judge did not say that the Pattersons’ intention to resume farming was a serious and realistic one. He said they “have stated an intention of resuming farming as soon as they are able.” No doubt they have such an intention. Dairy farming was the Pattersons’ business when they went broke. If the price of dairy products rises and the cost of production falls, it would be natural for them to want to go back into the business they know. And they are continuing to live on the property that they formerly operated as a dairy farm, so that to get back into the farming business all they need do is buy another herd of cows and buy or lease the necessary equipment for a dairy farm — though the aggregate investment that would be required is not, of course, a trivial one. But apart from the fact that the Pattersons live on a dairy farm — a relevant but not conclusive indication of their future intentions — there is nothing in the evidence or in the bankruptcy judge’s discussion to indicate that the Pattersons’ return to dairy farming is imminent, or even likely in the long term. The fact that they auctioned off what they claim are the essential tools of their trade (the cows and the tractor) is evidence against their having any intention of resuming dairy farming in the foreseeable future. However, this may be quite irrelevant, if either of the first two points made above is correct.
 

 Thus we are not persuaded by the bank’s first argument, and move on to the second, which is that there is no tools of the trade exemption
 
 in proceeds.
 
 The statute indeed says nothing about exempting an interest in such proceeds. The idea behind the exemption is that the debtor will hang on to his tools so that he can continue in his trade despite having gone broke. If he divests himself of the tools, preferring cash, the purpose of the exemption can no longer be fulfilled. We disagree with the contrary conclusion in
 
 In re Brzezinski, supra,
 
 65 B.R. at 339.
 

 An exception to the principle that there is no exemption in the proceeds of a sale of tools of the trade is necessary, however, to cover the following situation: the debtor has a tool worth $800 and is forced to sell it because, the exemption being only $750, $50 worth of the tool belongs to his creditors; and he immediately buys a cheaper or smaller tool so that he can continue in his trade, maybe on a reduced scale. The purpose of the exemption would be fulfilled in such a ease and we may therefore assume that the exemption would be available. But not in the present case; the Pattersons have expressed no intention of using the proceeds of the auction to buy cheaper cows or a cheaper tractor.
 

 The biggest problem with the bank’s second argument (no exemption in proceeds) is that when the petition to convert the bankruptcy proceeding from Chapter 11 to Chapter 7 was filed and the tools of the trade exemption first requested, the cows and tractor had not been transformed into cash. The auction had not yet been held; the exemption sought was not an exemption of proceeds. The problem may not be insuperable. Again we recur to the purpose of the tools of the trade exemption— to facilitate the debtor’s continuation in his trade. If before the creditors’ liens have been nullified, the debtor decides to leave his trade and he therefore sells his tools, we doubt whether he can prevent the liens from attaching to the proceeds. His equities are weak, for he is no longer trying to hang on to the tools of his trade; on what ground therefore should he be allowed to remove assets from the estate?
 

 But we need get no deeper into this thicket of interesting questions, for there is an independent reason why the Pattersons are not entitled to a tools of the trade exemption: as the bank urges in its third argument, neither cows, nor tractors or other farm machinery, are tools (or implements) of the trade within the meaning of the statute. This question has divided the
 
 *1146
 
 bankruptcy courts. For example, compare
 
 In re Yparrea,
 
 16 B.R. 33, 35 (Bankr.D.N.Mex.1981), with
 
 In re Walkington,
 
 42 B.R. 67, 72 (Bankr.W.D.Mich.1984). But it is a novel question at the court of appeals level. There is authority at this level, though not in this circuit, on the question whether liens on farm machinery may sometimes be avoided by virtue of section 522(f), but that question is distinct. Section 522(f) allows the avoidance of liens on property exempt not only by virtue of 522(d), the list of federal exemptions (that is, the exemptions created by the Bankruptcy Code rather than merely absorbed by it from state law), but also by virtue of state exemption laws, some of which exempt tools of the trade more broadly than section 522(d) does. The same language in section 522(f), since it could be picking up a tools of the trade exemption in state law as well as the tools of the trade exemption (which need not have the same scope) in 522(d), could mean two different things. Thus, cases like
 
 In re Liming,
 
 797 F.2d 895, 899-901 (10th Cir.1986);
 
 In re LaFond,
 
 791 F.2d 623, 626-27 (8th Cir.1986), and
 
 Augustine v. United States,
 
 675 F.2d 582 (3d Cir.1982), all of which allow a lien on farm machinery to be avoided under (f), do not necessarily control the present case, which is under (d).
 
 Liming
 
 involved a state law exemption for tools of the trade rather than the federal exemption. In
 
 LaFond
 
 it is impossible to tell from the court of appeals’ opinion whether the exemption was claimed under (d)(6) or under state law. The opinion of the bankruptcy judge shows that it was the former, see 45 B.R. 195, 200-02 (Bankr.D.Minn.1984), but, so far as appears, this was not made an issue at any higher level. t In
 
 Augustine
 
 the issue was whether the $750 ceiling in (d)(6) applies to (f), and while the case involved a tractor, the court merely assumed that the tractor was within the scope of (d)(6); it is not clear whether this had ever been made an issue. See 675 F.2d at 584. None of these cases is authority with respect to the scope of the (d)(6) exemption.
 

 The Pattersons point out that both tractors and cows are instrumentalities for turning raw materials (grass, hay, water, etc.) into salable products (milk, cheese, etc.) and therefore are tools of the farming trade in a broad sense. But as the Patter-sons’ able counsel readily acknowledged at argument, a businessman’s secretary is by the same token a tool of the trade; indeed, all capital and labor inputs are tools in this sense; the only things a business buys that are not tools of its trade are raw materials. If “tools” is to be given so capacious a definition as the Pattersons urge, then the exemption is not for the tools of a person’s trade but for the capital assets of his business, even though it is to those assets that creditors primarily look for repayment of the bankrupt’s debts. The broad definition, moreover, makes it hard to explain the statute’s explicit mention of so petty an item as “professional books,” which rarely (though sometimes) will have a substantial value, or the ceiling of $750 per debtor. Granted, the “wild card” exemption may as we shall see raise the ceiling as a practical matter. But if, for example, a printing proprietorship goes bankrupt, what sense would it make to allow the owner to exempt $750 from the auction of a million dollar printing press? The purpose of the tools of the trade exemption is to enable an artisan to retain tools of modest value so that he is not forced out of his trade. Although as a matter of semantics farm “implements” could be thought to cover machinery and vehicles as well as hand tools, this would be an incongruous interpretation. There would be no point in allowing a debtor to exempt $750 worth of equipment that might have a market value of many thousands of dollars. He would have to sell it anyway, and probably he could not replace it; certainly he could not continue to
 
 use
 
 it in his trade.
 

 The history of the exemption is the strongest evidence that it was not meant to encompass the items that the Pattersons are seeking to exempt. States have long granted an exemption for tools or implements of the trade, and in interpreting these exemptions state courts have generally distinguished between personal hand tools of modest value, on the one hand, and machinery on the other. See 3 Collier on
 
 *1147
 
 Bankruptcy ¶ 522.15, at p. 522-52.3 n. 1 (15th ed., King ed., 1986). Granted, some states are far more generous than (d)(6), a good example being the Minnesota statute discussed in
 
 In re Schuette,
 
 58 B.R. 417, 419 (Bankr.D.Minn.1986), which exempts, “farm machines and implements used in farming operations by a debtor engaged principally in farming, livestock, farm produce, and standing crops, not exceeding $10,000 in value.” But that is not the language of (d)(6). The Pattersons do not claim the exemption available under Wisconsin law, which is also broad. See Wis. Stat. § 815.18(6);
 
 In re Erickson,
 
 815 F.2d 1090 (7th Cir.1987).
 

 There is no indication that Congress, by taking over a familiar term from state law as the basis for a modest federal exemption that would be an alternative to the state exemptions, see 11 U.S.C. § 522(b), meant to expand it. If Congress had had such an intention, it probably would not have imposed a $750 ceiling — for what, to repeat, could be the purpose of allowing a farmer to exempt a tiny fraction of the value of a piece of heavy farm machinery or of a herd of cattle? Few farmers will be able to use the wild-card exemption to jack this figure up. To regard cows and other livestock as “tools” or “implements” does particular violence to the English language, and there is no indication that the terms are being used in a technical sense. There would be no semantic violence in regarding the Pattersons’ tractor as a tool of the farming trade (cf.
 
 In re Erickson, supra),
 
 but, while the question is a close one, we think the tractor is no more a tool of the trade in the statutory sense than the cow is. The tractor is not a modest implement but an expensive piece of machinery. It is one of the principal capital assets of a small farm. To exempt it would be like exempting the airplanes owned by an air charter service. This can’t have been what Congress had in mind in allowing an exemption limited to $750. The relevant tools of the trade are the rakes and other hand tools that Mr. Patterson continues to own, and to use as a dairy hand following the bankruptcy. Cf.
 
 In re Harrell,
 
 72 B.R. 107, 111 (Bankr.N.D.Ala.1987).
 

 Having dealt with (and disallowed) the Pattersons’ tools of the trade exemption, we must now consider their “wild-card” exemption. The cows and the tractor may not be tools of the trade — are not, we think — yet at the time of the auction they were the Pattersons’ property, and the exemption extends to “any property” of the debtor(s). True, as an original matter we might have thought the referents of “any property” in (d)(5) (the wild-card provision) were the various types of real and personal property listed in the preceding four subsections. See generally Comment,
 
 The General Exemption of Section 522(d)(5) of the 1978 Bankruptcy Code,
 
 49 U.Chi.L.Rev. 564 (1982). Subsection (d)(1) creates a relatively generous exemption of $7,500 for (essentially) a home owned by the debtor. The next three subsections create limited exemptions for a car, certain household items, and jewelry; but since these exemptions are available to the debtor whether or not he owns a home, the overall structure is highly disadvantageous to the debtor who doesn’t own a home — unfairly so, it might seem, since he is likely to be even more marginal economically than the home-owning bankrupt. The wild-card provision corrects the imbalance by allowing the debtor to use the unused portion of his home exemption to raise the ceilings on the car, household goods, and jewelry exemptions; it would not follow that the provision exempted commercial assets as well. The only commercial assets that can be exempted, it would seem, are those covered by subsection (d)(6) — tools of the trade, implements, and professional books.
 

 This argument is foreclosed in this circuit, however, by
 
 In re Smith,
 
 640 F.2d 888, 891-93 (7th Cir.1981), a recent decision by this court that we are not disposed to reexamine;
 
 stare decisis
 
 has its claims.
 
 Smith
 
 holds that the wild-card exemption is applicable to any property of the bankrupt estate (in that case causes of action under the federal Truth in Lending Act and a parallel state statute).
 

 
 *1148
 
 If it were not for the bank’s lien, therefore, the Pattersons would be entitled to exempt $15,800 from the bankrupt estate. But since the bank had a lien on these assets, the Pattersons not only need an exemption; they need lien avoidance. Section 522(f) says that the debtor can avoid the fixing of a lien “to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section”; and the wild-card exemption is such an exception. See 11 U.S.C. § 522(b)(1). But one must read on: not every type of lien can be avoided; only (so far as relevant here) a lien on goods specified in (d)(3) (certain household furnishings), in (d)(4) (jewelry), in (d)(6) (tools of the trade), and in (d)(9) (health aids) can be avoided. See text of section 522(f), quoted earlier in this opinion. Since cows and tractors are not tools of the trade, a lien on them can’t be avoided by virtue of 522(f)(2)(B). And the cows of course are not “animals ... held primarily for the personal, family, or household use of the debtor or a dependent of the debt- or.” 11 U.S.C. § 522(f)(2)(A);
 
 In re Thompson,
 
 750 F.2d 628, 630-31 (8th Cir.1984). They are not pets. We need not consider the bank’s further argument that, if these things were within section 522(f), still a lien on them could be avoided only to the extent of the exemption, which would mean in the case of tools of the trade the first $750 of the lien. That was the issue in
 
 Augustine v. United States
 
 and
 
 In re LaFond,
 
 both cited earlier.
 

 To sum up, the petition for exemption was properly granted to the extent of the wild-card exemption of $15,800, but the motion to avoid the bank’s lien on the proceeds from the auction of the cows and the farm equipment should have been denied. The case is remanded for further proceedings consistent with this opinion. There will be no award of costs in this court.
 

 So Ordered.