**In re Dorian J. HIRT, Debtor.**

**Bankruptcy No. 88–02237.**

United States Bankruptcy Court,
E.D. Wisconsin.

March 21, 1989.

Jeffrey J. Drach, Wausau, Wis., for debtor.

John C. Wenning, Appleton, Wis., for Farm Credit Bank of St. Paul.

Michael C. Williams, for U.S. Trustee.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

The amended disclosure statement of Dorian J. Hirt ("debtor" or "Mr. Hirt") is before the court for approval. Also pending are a motion filed by the United States Trustee for conversion to a case under chapter 7 or, in the alternative, dismissal of this chapter 11 case and a motion for relief from the automatic stay filed by Farm Credit Bank of St. Paul ("FCB"), holder of a first mortgage on the debtor's farm.

An evidentiary hearing on all of these matters was conducted on February 7, 1989

and February 14, 1989. Testimony was received from Paul Anderson, director of special credit for FCB, Darwin Zeinert, farm training instructor for North Central Technical College, and Mr. Hirt.

## FACTS

On May 18, 1988, the debtor filed a petition for relief under chapter 11. This occurred one day before a scheduled sheriff's sale of the debtor's farm pursuant to a state mortgage foreclosure suit. The debtor initially appeared *pro se* but, in October of 1988, retained Atty. Jeffrey J. Drach to represent him in this case.

The debtor's farm consists of 320 acres, including approximately 120 acres of tillable land and 120 acres of standing timber. In November of 1985, the debtor sold most of his farm machinery and his entire herd of 50 cows. Since then, he has not engaged in farming for himself but has been helping other farmers with their operations. Since 1985, his income has been minimal. According to Mr. Hirt's testimony, he earned approximately $2,000 to $3,000 in 1988. He has not, however, provided any substantiation as to his income for 1986, 1987 and 1988. Shirley Hirt, debtor's wife, is employed as a nurse's assistant and presently earns approximately $9,000 per year. Mr. and Mrs. Hirt do not currently reside on the farm being foreclosed. They live on Cedar Street in Tigerton, Wisconsin, with two of their four sons (ages 12 and 14).

The debtor's assets consist of the farm in foreclosure, which has an estimated value of approximately $150,000. In addition, the land contains standing timber believed to have a value of at least $135,000. The farm (including land and standing timber) is subject to FCB's first mortgage with an outstanding balance of approximately $203,000 and to a second mortgage held by the debtor's mother, Ardale Hirt, with a balance due of approximately $26,000. The debtor also owes approximately $8,500 to First National Bank in Tigerton ("the bank"), collateralized by the debtor's farm machinery and equipment, much of which is in the process of being liquidated by the bank. It is anticipated that there will be a remaining deficiency after liquidation of the bank's collateral. The debtor's obligations to FCB, Ardale Hirt and First National Bank in Tigerton total approximately $237,500. The debtor also owes accrued real estate taxes of approximately $26,000 and unsecured debts totalling approximately $24,000.

Under his plan, the debtor would resume his own farm operations. He has prepared a crop plan and intends to purchase 55 milking cows. He also intends to cultivate 120 acres of the farm under foreclosure and lease an additional 35 acres of land. He proposes to accomplish this by the following means: from the sale of the standing timber, pay in full the outstanding real estate taxes (approximately $26,000), retain $5,000 for planting expenses, retain $45,000 for the purchase of the 55 milking cows, and retain $10,000 to implement his crop plan. Assuming the standing timber sells for $135,000, this would leave approximately $49,000 which would then be applied against the outstanding loan due to FCB.

## ADEQUACY OF DISCLOSURE STATEMENT

The amended disclosure statement is replete with deficiencies which preclude a finding of "adequate information" within the meaning of § 1125(a) of the Bankruptcy Code. The deficiencies include gross inaccuracies in cash flow projections and a lack of detail as to assets and liabilities. The paramount concern permeating this case is the plan's lack of feasibility. A court may refuse to approve a disclosure statement when it is apparent that the plan accompanying the disclosure statement is

not confirmable. *In re Atlanta West VI,* 91 B.R. 620 (Bankr.W.D.Ga.1988); *In re Unichem Corp.,* 72 B.R. 95 (Bankr.N.D.Ill. 1987).

■ The disclosure statement is dependent upon Mr. Zeinert's cash flow projections. Those projections are seriously flawed when tested against the debtor's actual circumstances. Zeinert's cash flow projections are based upon an "ongoing farm" rather than a "start up farm." There are major differences in calculations for an "ongoing farm" and for a "start up farm." Zeinert conceded that had he known the purpose for which his projections were to be used, they would have been prepared differently. He failed to conduct an on-site inspection of the debtor's farm. His analysis was made after one meeting with the debtor in January of 1989. By Zeinert's own admission, he didn't have sufficient time to accurately prepare the projections. The projections used were based upon experiences of other farms and not geared to the debtor's particular circumstances. For example, in the category labelled "miscellaneous income," Zeinert allocated an amount to be realized from government support programs without the knowledge that the debtor had never participated in any such programs and had no plans to do so in the future. Zeinert also applied an estimate of 13,000 lbs. of milk per cow per year as the debtor's forecasted production. Records of the debtor's actual past farm production reveal that he never attained that level and instead averaged approximately 10,600 lbs. of milk per cow per year. Zeinert also utilized 52% of gross farm income as an estimate of the debtor's anticipated operating expenses. The debtor's historical performance reflects operating expenses of approximately 59%. Zeinert also acknowledged he did not provide for replacement of culled cows and stated that the culled cows would average approximately 25% to 35% annually. He also did not provide a reserve for the debtor's income tax expenses in his cash flow projections.

Anderson's cash flow projections were more meaningful. They were based upon the debtor's actual past performance. In *In re Euerle Farms, Inc.,* 861 F.2d 1089 (8th Cir.1988), the court asserted that the debtor's income and expense projections must be considered in conjunction with the debtor's actual past performance. *See also In re Stuart Motel, Inc.,* 8 B.R. 48 (Bankr. S.D.Fla.1980); *In re Merrimack Valley Oil Co., Inc.,* 32 B.R. 485 (Bankr.D.Mass.1983); *In re Marchand,* 61 B.R. 81 (Bankr.E.D. Ark.1986). In *In re Crowley,* 85 B.R. 76 (W.D.Wis.1988), Judge Shabaz recently declared that a chapter 12 plan based upon speculation and future production will not be confirmed after looking at the debtor's past performance despite the debtor's good intentions to change. Judge Shabaz stated, *In re Crowley,* 85 B.R. at 79:

"[i]t is entirely inappropriate to legally bind a bankruptcy court to future projections regardless of past behavior."

Based upon the record developed during the hearings, this court has prepared its own projections, which produce the following conclusions:

*Farm Income.* The debtor projected annual income of $104,099. FCB projected such annual income at $94,075. The court concludes that the debtor's annual income will be $100,000.

*Operating Expenses.* The debtor's projections of operating expenses are $53,250 (52% of gross income). FCB's projections of operating expenses are $55,625. This court utilizes the actual experience of the debtor (59% of gross income) and concludes that his annual operating expenses will be $59,000.

*Living Expenses.* Zeinert has projected living expenses for the debtor and his family of $14,367. FCB has projected the debtor's annual family living expenses at $17,000. The court adopts Zeinert's computations. After applying $9,000, from Mrs. Hirt's income, against living expenses, this produces a deficit of $5,000.

The results of the court's projections are therefore:

| | | |
|---|---|---|
| Farm income | | $100,000 |
| Operating expenses | $59,000 | |
| Net living expenses | $ 5,000 | − 64,000 |
| NET AVAILABLE FOR PLAN | | $ 36,000 |

Based upon these calculations, in the first year of the debtor's plan (June 1, 1989 through May 31, 1990), the net available for the plan must be allocated on the following basis:

| | |
|---|---|
| Chapter 11 administrative expenses for Atty. Drach | $ 6,000 |
| Livestock replacement (28% × 55 cows × $800 per cow) 1 | $12,320 |
| Start up costs | $ 6,500 |
| Payments under the plan to unsecured creditors and First National Bank in Tigerton | $10,560 |
| TOTAL | $35,380 |

This leaves a $620 margin, which is much too thin.

Using these calculations for the second year of farm operations (June 1, 1990 through May 31, 1991), the net available for the plan is:

| | |
|---|---|
| Livestock replacement | $12,320 |
| Payments to FCB (commencing August 1, 1990) | $12,000 |
| Payments under the plan to unsecured creditors and to First National Bank in Tigerton (for any remaining balance) | $10,560 |
| TOTAL | $34,880 |

This results in a balance of $1,120, which still leaves only a marginal operating cushion. The court in *In re Marchand*, 61 B.R. 81 (Bankr.E.D.Ark.1986), held that a cushion of less than $3,000 per year leaves too little room for unanticipated expenses.

There are too many contingencies under the debtor's plan. They include:

1. Uncertainty as to the amount of "start up costs" and as to the source of funding these costs. The debtor testified at least $6,500 is needed. He stated he hoped to acquire the money from the Bank of Birnamwood but acknowledged he was presently only in the talking stages with the bank.

2. Lack of assurance that the debtor will be able to obtain the use of necessary farm machinery. Although Mr. Hirt has

1. The testimony revealed that the price range of milking cows was $800 to $1,000 per cow. For

discussed this with his friends and neighbors and is optimistic, he has no firm written commitments.

3. Uncertainty that $45,000 (the amount debtor has allocated to buy 55 milking cows) will be sufficient.

4. Uncertainty as to the debtor's ability to operate his farm primarily through labor to be furnished by himself and his family and with only $1,000 budgeted annually for hired labor.

5. Uncertainty as to the debtor's ability to attain his projected goal of $3,359 for "miscellaneous income."

6. Uncertainty as to the debtor's ability to produce 13,000 lbs. of milk per cow per year. Mr. Hirt's assertions that he will "rededicate" himself and Zeinert's testimony that "with guidance, Hirt can do a fine job," are not persuasive. The court in *In re Snider Farms, Inc.*, 83 B.R. 1003, 1012 (Bankr.N.D.Ind.1988), stated (citing *In re Bergman*, 585 F.2d 1171, 1179 [2d Cir. 1978]):

> "Sincerity, honesty and willingness are not sufficient to make a plan feasible and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."

To require FCB to exchange "dollars in hand" to be generated from the sale of the standing timber, for a new farm operation by the debtor would be impractical and risky. This plan lacks feasibility. The court will not permit the debtor to "roll the dice" with FCB's money.

## MOTION TO DISMISS OR CONVERT

■ The record amply demonstrates an inability by the debtor to effectuate a feasible plan. This case is over ten months old, and any further delays are unreasonable and prejudicial to creditors. As the court stated in *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 374 (5th Cir.1987), aff'd, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1987):

purposes of these calculations, the court has applied the lower figure of $800.

"Reorganization is not a Holy Grail to be pursued at any length. Creditors are entitled to a prompt determination of efficacy."

The debtor has been given an opportunity to reorganize but cannot be permitted to remain in the chapter 11 case to the detriment of his creditors. "Cause" within the meaning of § 1112(b) exists for dismissal or conversion to a case under chapter 7.

11 U.S.C. § 1112(c) of the Bankruptcy Code prohibits a bankruptcy court from ordering a conversion to a case under chapter 7 where the debtor is a farmer. It is unclear from the record if Mr. Hirt qualifies as a farmer under 11 U.S.C. § 101(19). The Bankruptcy Code definition of a farmer is dependent upon a determination that the debtor received more than 80% of his gross income for the taxable year immediately preceding the filing of the bankruptcy petition "from a farming operation owned *or operated* (emphasis added) by such person." The term "gross income" under 11 U.S.C. § 101(19) must be given its technical federal income tax meaning. *Matter of Wagner*, 808 F.2d 542 (7th Cir.1986). From the testimony presented, it is unknown whether Mr. Hirt "operated" a farm or farms of others in 1987. Moreover, *In re Hettinger*, 95 B.R. 110 (Bankr.E.D.Mo. 1989), held that farm labor wages derived on someone else's farm constitute farm income. The fact that the debtor did not produce his income tax returns to enable the court to address this issue only adds to the existing maze. At the conclusion of the evidentiary hearing, the United States Trustee requested that this case be dismissed. Under these circumstances and because no creditor has opposed either dismissal or conversion, the court need not address the conversion issue and, pursuant to § 1112(b)(1), (2) and (3) GRANTS the motion for dismissal as being in the best interest of creditors and the estate.

In view of the foregoing, FCB's motion for relief from the automatic stay has become moot.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.