**In re Ray W. NEAL, Debtor.**

**Bankruptcy No. 91–31295–C.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

March 8, 1992.

Jerry Tanzy, El Paso, Tex., for debtor.

E.P. Bud Kirk, El Paso, Tex., for Sunwest Bank of El Paso.

## ORDER ON MOTION OF RAY W. NEAL TO AVOID LIEN OF SUNWEST BANK OF EL PASO IMPAIRING DEBTOR'S EXEMPTIONS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Motion of Ray W. Neal, Debtor, to Avoid Lien of Sunwest Bank of El Paso Impairing Debtor's Exemptions. Upon consideration thereof, the court finds and concludes that the Motion is well taken, and that the relief requested therein should be granted. The following Decision and Order constitutes the court's findings of fact and conclusions of law.

### JURISDICTION

This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding. 28 U.S.C. § 157(b); 11 U.S.C. § 522(f).

### FACTUAL BACKGROUND

Ray Neal ("debtor") is the sole proprietor of Diversified Design Services, a computer-aided drafting and scanning service; for the past two years, he has worked out of his home, using sophisticated computer equipment and software to generate engineering drawings and schematics. The drawings produced by the Debtor could be produced by hand, but time limitations and industry standards necessitate the use of computer technology to remain competitive. Specifically, Debtor's clients require

not only hard copies of the drawings, but a computer disk containing the information as well. Debtor would also be unable to generate drawings for clients quickly enough to compete using traditional drafting techniques.

In June 1991, Debtor borrowed approximately $10,060.30 from Sunwest Bank of El Paso. As security for the loan, Debtor gave Sunwest a security interest in various pieces of computer equipment used by the debtor in his business.[1] As of December 1991, Sunwest estimated the value of the collateral to be approximately $12,000.

Debtor filed for relief under Chapter 13 of the Bankruptcy Code on November 5, 1991. Subsequently, he filed this motion, seeking to avoid Sunwest's lien against the computer equipment under § 522(f)(2)(B), to the extent that it impairs an exemption to which he may be entitled. At the hearing, all parties agreed to stipulate that Sunwest's security interest is non-purchase money and non-possessory; the sole issue to be decided by the court is whether the computer equipment at issue qualifies as a "tool of the trade" for the avoidance purposes of § 522(f)(2)(B).

Sunwest Bank contends that the computer equipment at issue is not a "tool of the trade" within the plain meaning of those terms of federal law as contained in § 522(f)(2)(B). Sunwest urges the court to establish a narrow federal definition of the terms for purposes of lien avoidance, rather than relying on state law definitions developed under the rubric of broadly-construed exemption statutes. Sunwest also argues that the equipment is not of the "inconsequential value" contemplated by Congress in the enactment of § 522(f)(2). Finally, Sunwest argues that allowing the Debtor to avoid the lien on the computer equipment will severely limit, if not eliminate, the ability of sole proprietorships to obtain non-purchase money working capital financing.

Debtor argues that the equipment fits squarely within the definition of tools of the trade, as it has been applied under both federal and state exemption statutes and the lien avoidance statutes. Debtor further argues that, although the "inconsequential value" requirement is consistent with the purpose underlying subsection (f)(2)(A) (involving household goods), it is entirely inconsistent with the purpose underlying subsection (f)(2)(B), involving "books, implements, and tools, of the debtor's trade," and should not be applied so as to deprive Debtor of the tools essential to his fresh start.

## ANALYSIS

 A debtor who files for relief under the Bankruptcy Code must surrender all of his property for the benefit of his creditors; the property so surrendered comprises the bankruptcy estate. *See* 11 U.S.C. § 541; *see also In re Lucas*, 924 F.2d 597, 599 (6th Cir.1991). However, 11 U.S.C. § 522 provides debtors with several exemptions which may be used to prevent certain property from being distributed to unsecured creditors. *See Augustine v. United States*, 675 F.2d 582, 584 (3d Cir. 1982) (citing H.Rep. No. 595, 95th Cong., 1st Sess. 126 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6087. The purpose of the exemption provisions is to secure the debtor's fresh start, so as to prevent his becoming "a public charge". *See In re Taylor*, 861 F.2d 550, 552 (9th Cir.1988) (citing H.Rep. No. 595, 95th Cong., 2d Sess. 126 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6087.

---

1. Sunwest claims a security interest in the following equipment: a DTK computer (Keen 2000) SN:G9020331; Calcomp 1025 Plotter SN:906YO7748; Hewlett Packard Laserjet II Printer Model 33471A SN:2940J26748; 101 Keyboard SN:00114111789; Digitizer Board SN:0101700097820373545; Houston Instrument LDS 4000 Scanner SN:409009–10042. The documentation on the loan and the security interest reflect that Sunwest regarded the loan as purchase money, although the Debtor contends that the equipment was purchased before the funds were received. For the purposes of this motion, and in order to have the court reach the lien-avoidance issue, Debtor and Sunwest have stipulated that the security interest is non-purchase money and non-possessory.

■ In furtherance of the fresh start policy, Congress also provided debtors the ability to place certain of their property beyond the reach of secured creditors. *See In re Taylor*, 861 F.2d at 552. To the extent that a debtor is entitled to an exemption, be it under federal or state law, he may avoid certain liens in particular types of property. 11 U.S.C. § 522(f); *see also In re Heape*, 886 F.2d 280, 282 (10th Cir.1989); *In re Patterson*, 825 F.2d 1140, 1146 (7th Cir.1987); *Augustine v. United States*, 675 F.2d at 584. 11 U.S.C. § 522(f) provides in pertinent part:

> (f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled to under subsection (b) of this section, if such lien is—
>
> . . .
>
> (2) a nonpossessory, nonpurchase-money security interest in any—
>
> (A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
>
> (B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor
>
> . . .

11 U.S.C. § 522(f)(2)(A), (B). Thus, liens may only be avoided to the extent that they impair an exemption to which the debtor would be entitled under § 522(b). Under that section, a debtor may elect either the federal exemptions found in § 522(d), the federal exemptions as modified by the states, or state exemptions. *See* 11 U.S.C. § 522(b), (d); *see also In re Taylor*, 861 F.2d 550, 552 (9th Cir.1988) (reviewing exemptions available under § 522(b)).

Texas created its own classes of exempt property, an exemption scheme with a long pedigree. *In re Leva*, 96 B.R. 723, 733 n. 14 (Bankr.W.D.Tex.1989) (first exemption statutes enacted during the Republic, six years before Texas' admission into the Un-

ion). The Texas Property Code was amended most recently in 1991, to provide that personal property constituting "tools, equipment, books and apparatus, including boats and motor vehicles used in a trade or profession" may be claimed as exempt. Tex.Prop.Code Ann. § 42.002(a)(4) (West 1991). Families may now exempt up to $60,000, while single adults may exempt up to $30,000. Tex.Prop.Code Ann. § 42.001 (West 1991).

■ The Texas exemption for tools, equipment, books, and apparatus used in a trade or profession has been limited to those items that are peculiarly adapted to the trade or profession. *See In re Weiss*, 92 B.R. 677, 679 (Bankr.N.D.Tex.1988) (construing predecessor statute, § 42.-002(3)(B)); *see also In re Swift*, 124 B.R. 475, 481 (Bankr.W.D.Tex.1991) (insurance agent not allowed to exempt typewriter). The exemption must be of items "fairly belonging to" the trade; those items which have a "merely general value and use" in a business are not included within the scope of the exemption. *See In re Swift*, 124 B.R. at 481 (citing *Weiss, supra,* and *Meritz v. Palmer*, 266 F.2d 265, 268 (5th Cir. 1959)); *see also In re Leva*, 96 B.R. at 739 (citing *McMillan v. Dean*, 174 S.W.2d 737, 739 (Tex.Civ.App.—Austin 1943, writ ref'd w.o.m.). Further, the only limitation on the value of the tools, equipment, books or apparatus is the general limitation found in § 42.001; there is no longer a requirement that tools of the trade be small hand or mechanical tools. *See* Tex.Prop.Code Ann. § 42.001 (West 1991); *see also Meritz v. Palmer*, 266 F.2d at 268–9; *In re Hernandez*, 131 B.R. 61, 5 T.B.C.R. 387 (Bankr. W.D.Tex.1991) (Monroe, B.J.).

■ The computer equipment in the case *sub judice* is well within the scope of the Texas exemption for tools of the trade; it belongs just as fairly to Debtor's trade today as would a T-square and drafting table forty years ago, and it is of considerably more than "merely general value" to the business. Indeed, Debtor testified that the equipment, both hardware and software, is designed specifically for computer-aided drafting and that without the equip-

ment, he would be unable to provide the work-product required by his clients. It is true that some pieces of the equipment are generic in nature (e.g., the IBM-compatible 386SX computer, with 1MB of RAM and a 40MB hard drive), but it is the system's use as a unit which renders the system itself, in essence, a tool of the debtor's trade. Take away the computer, for example, and the specialized software becomes nothing more than an otherwise useless "circular plate coated with ferromagnetic particles," *Webster's New Universal Unabridged Dictionary*, 2d ed. (Dorset & Baber 1983). Removing the computer itself from the otherwise specialized equipment would be like removing the engine from a tow truck. *See Hernandez, supra.* The court concludes that the Debtor is entitled to claim the system as exempt under the Texas statute.[2]

■ Having concluded that the Debtor is entitled to an exemption under § 522(b), the court now turns to § 522(f)(2)(B) to determine whether the Debtor is entitled to avoid Sunwest's lien on the equipment. While state law determines the availability of exemptions, it is federal law that determines avoidability of liens. *See In re Heape*, 886 F.2d 280, 282 (10th Cir.1989); *In re Thompson*, 750 F.2d 628, 630 (8th Cir.1984); *cf. In re Thompson*, 867 F.2d 416, 420–21 (7th Cir.1989) (using state law definition for § 522(f)(2)(B) purposes). A considerable number of courts have addressed lien avoidance under § 522(f)(2)(B), and a split of authority has developed over the phrase "tools, of the trade of the debtor".

■ Many cases have applied an "inconsequential value" test to § 522(f)(2)(B) actions (involving items relating to a debtor's continuing in his or her line of work), without differentiating such actions from those brought under subsection (f)(2)(A) (involving household goods used for personal use), where that test is more easily justified by the legislative history's express discussion. *Compare In re Sweeney*, 7 B.R.

814, 818–19 (Bankr.E.D.Wisc.1980) (lien avoidance subject to value limitations) *and In re Yparrea*, 16 B.R. 33, 34 (Bankr. D.N.M.1981) (same); *with In re Liming*, 797 F.2d 895, 899–901 (10th Cir.1986) ("implement" worth $30,000 subject to lien avoidance), *Augustine v. United States*, 675 F.2d 582, 586 (3d Cir.1982) (lien avoidance limited only by extent of exemption) *and In re Seacord*, 7 B.R. 121, 123–4 (Bankr.W.D.Mo.1980) ("implement" subject to lien avoidance under state exemption statute without limit as to value). In so doing, many of these cases have thereby limited the avoidance power to small hand and mechanical tools, or tools of relatively little resale value. *See e.g., In re Harrell*, 72 B.R. 107, 111 (Bankr.N.D.Ala.1987) (lien avoidance provisions apply to property of relatively insignificant value); *In re Trainer*, 56 B.R. 21, 23 (Bankr.S.D.Tex.1985) (tools and implements exemption limited to small resale value); *In re O'Neal*, 20 B.R. 13, 15–17 (Bankr.E.D.Mo.1982) ("implements" limited to small implements). These courts have drawn further support for this restrictive definition from the $750 limitation on the federal exemption for tools of the trade found in § 522(d)(6), reading the monetary limitation into the lien avoidance statute. *See* 11 U.S.C. § 522(d)(6); *see also In re Harrell*, 72 B.R. at 111; *In re Trainer*, 56 B.R. at 23. In addition, a few courts have argued that to allow debtors to avoid liens on any property other than that of little resale value would virtually eliminate nonpurchase-money financing for sole proprietorships (especially farmers). *See In re Trainer*, 56 B.R. at 23 (legislative history of § 522(f) does not support conclusion that Congress intended to severely restrict nonpurchase-money financing).

Most of the circuit courts which have examined the issue have reached a different result, however. *See In re Heape*, 886 F.2d 280, 282 (10th Cir.1989); *In re Thompson*, 867 F.2d 416, 420 (7th Cir.1989); *In re LaFond*, 791 F.2d 623, 627 (8th Cir.1986);

---

**2.** Obviously, the court is *not* crafting a generalized exemption for personal computers, nor should one be inferred.

*Augustine v. United States,* 675 F.2d 582, 586 (3d Cir.1982). These courts point out that § 522(f)(2)(B) was enacted to provide debtors with the *means* to facilitate the fresh start promised by the Bankruptcy Code, by preserving for them the tools, implements, or professional books of their trade they are presumed to need to continue earning a livelihood after bankruptcy. "A fresh start cannot be attained by returning a debtor to point zero; subsection (f)(2)(B) encompasses property which is necessary to give substance to the concept of a fresh start." *In re LaFond,* 791 F.2d 623, 627 (8th Cir.1986) (citing *In re Pommerer,* 10 B.R. 935, 942 (Bankr.Minn.1981)). A construction restricting § 522(f)(2)(B) to property of little resale value overlooks the principal purpose of this provision (in contradistinction to subsection (f)(2)(A)), leaving debtors fresh, but without a start. *See In re LaFond,* 791 F.2d at 627; *In re Pommerer,* 10 B.R. at 946; *In re Sugarek,* 117 B.R. 271, 273 (Bankr.S.D.Tex.1990). Regardless of the value of a given tool of the trade, it is nonetheless a tool of the trade, the lack of which could threaten the debtor's ability to make a living after bankruptcy.

Some courts which have engrafted the "of little resale value" gloss onto the language of § 522(b)(2)(B) have justified the gloss by trying to extend to tools of the trade the discussion of household goods found in the legislative history to § 522(f)(2), even though tools of the trade are clearly distinct in kind and purpose from personal items held for household use.[3] *Harrell,* 72 B.R. at 111; *Trainer,* 56 B.R. at 23; *O'Neal,* 20 B.R. at 15–17. Unlike the consumer situation, in which the lender's presumed motivation in taking the security interest is *solely* the leverage that the threat of repossessing the family sofa (as opposed to the intrinsic value of the sofa as collateral for the loan), the lender's motivations in the business lending setting are likely to include *both* the leverage that comes from the threat of repossession *and* the intrinsic resale value of the collateral. The very fact that the statute provides a separate subsection for tools of the trade suggests that Congress too appreciated this distinction. The rationale spelled out in the legislative history for subsection (A) simply does not apply with equal force to subsection (B).

Courts which have insisted on glossing over the difference in kind between the kinds of things covered by subsections (A) and (B) have also had to ignore the common sense plain meaning of the term "tools of the trade," in derogation of a basic principle of statutory construction. *See United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980) (courts must gave words in a statute their plain meaning, absent statutory definitions). Modern dictionary definitions of the terms "tool" and "trade" encompass nearly any object or implement used in carrying on work of any kind, or *any apparatus necessary to a person in the practice of a vocation or profession. See In re Bulger,* 91 B.R. 129, 131 (Bankr.M.D.Ala.

---

**3.** In fact, if they were not, there would be little reason for Congress' providing a separate subsection for each kind of item.

An examination of the legislative history reveals that Congress did indeed intend the lien-avoidance provision contained in § 522(f)(2)(A) to apply only to those items of little or no resale value. H.R.Rep. No. 595, 95th Cong., 2d Sess. 126–27 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6087–88; *see In re Thompson,* 750 F.2d 628, 630 (8th Cir.1984). Subsection (f)(2)(A) refers directly to household goods, and reflects Congress' concern with creditors who, in loaning money, would take a security interest in all of a debtor's personal property, and then use the threat of foreclosure to force the debtors into making payments. *See id.; United States v. Security Industrial Bank,* 459

U.S. 70, 84, 103 S.Ct. 407, 415–16, 74 L.Ed.2d 235 (1982). The "of little resale value" requirement arises from the Congressional assumption that the goods in which the creditors were taking security interests were really of little value to anyone but the debtors, and that the creditors took the security interests with no intention of foreclosing, for the sole purpose of coercing repayment. *Id.* The application of the "of little resale" requirement to the lien avoidance provision in (f)(2)(A) is entirely consistent with the purpose of the provision. *Id.* Its force is considerably diminished when one gets outside the consumer lending situation and moves into the business lending situation to which subsection (f)(2)(B) is addressed, though of course the motive of the creditor is the same.

1988) (emphasis added) (*citing Webster's Third Int'l Dictionary of the English Language Unabridged* (1976)); *see also The American Heritage Dictionary of the English Language* 1353 (Houghton Miflin 1970) ("anything regarded as necessary to the carrying out of one's occupation or profession").[4] Restricting the phrase "tools of the trade" to small hand tools or tools of inconsequential resale value departs from the common understanding of the phrase likely employed by Congress.[5]

While we are at it, we might also look at the plain meaning suggested by the comma after the word "tools." ("... implements, professional books, or tools, of the trade of the debtor ...") *See In re Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Sunwest argues that the comma means that, instead of the expression "tools of the trade," we have simply "tools," a term much more likely to suggest small hand tools as opposed to a computer setup.[6] As enticing as the argument (and the example) might appear, they are illusory. The comma leads one to read the statutory sentence this way: implements of the trade of the debtor, professional books of the trade of the debtor, or tools of the trade of the debtor.

Spread out that way, it is more obvious what Congress had in mind—that what the debtor needed to continue practicing her trade (one might say whatever is "reasonably necessary," a term found elsewhere in both the state and federal exemption statutes), to the extent otherwise exempt, could be freed of nonpurchase money liens which by their operation tended to frustrate the debtor's fresh start. Again, we note the spin placed on the word "trade" in common parlance: "an occupation, especially one requiring skilled labor", *American Heritage*, at 1360; "a means of earning one's living; occupation; work; especially, skilled work, as distinguished from unskilled work or from a profession or business; a craft", *Webster's New Universal Unabridged Dictionary*, 2d ed., p. 1934 (Dorset & Baber 1983); "the business or work in which one engages regularly", *Webster's Ninth New Collegiate Dictionary*, p. 1250 (Merriam–Webster 1984). In common usage, the term "trade" (certainly in the context of a statute discussing the future of self-employed debtors after bankruptcy) carries with it so broad a meaning that Congress had no trouble with the notion of a trade involving "professional books," clearly reaching to protect the li-

---

**4.** Sunwest relies on the Oxford English Dictionary for authority that "tool" refers to hand tools and devices which directly "work" something (such as lathe). It further points out that "trade" suggests an artisan or craftsman, someone who works with one's hands, as distinguished from the "professions," again finding support in the OED. With the highest regard for this venerable work, the court is more persuaded by the general use dictionaries, because they tend to reflect general *usage*. As the editors of the American Heritage dictionary observed in their introduction,

> To furnish the guidance which we believe to be an essential responsibility of a good dictionary, we have frequently employed usage-context indicators.... But going beyond that, we asked a panel of 100 outstanding speakers and writers a wide range of questions about how the language is used today.... After careful tabulation and analysis of their replies, we have prepared several hundred usage notes to guide readers.... As a consequence, this Dictionary can claim to be more precisely descriptive, in terms of current usage levels, than any heretofore published—especially in offering the reader the lexical opinions of a

large group of highly sophisticated fellow citizens.

*The American Heritage Dictionary of the English Language* (W. Morris, ed.), Introduction, at vii (Houghton Miflin 1970). The OED, by contrast, tends to be more proscriptive in its approach, and also drags along with it usages from years, even centuries, past. When the task is to figure out the plain meaning of a term in a statute, a dictionary which attempts to describe common current usage will probably come closer to describing the sense given to a given term by a member of Congress.

**5.** That common understanding is further bolstered by what else is included in subsection (B)—"implements" (which are usually related to farming or construction, and which are often expensive) and "professional books" (which by designation relate to the practice of a profession as opposed to a "trade").

**6.** Sunwest's example is worth repeating. Imagine a table on which sit a computer, a screwdriver and a power drill. Were someone to ask, "Hand me those tools on the table," she would be surprised indeed were she handed the computer.

braries of doctors and lawyers. Under Sunwest's narrow read of "trade," doctors and lawyers do not have a trade, and presumably could not exempt their professional books, despite the fairly clear thrust of the statute to the contrary.

 Nor is this court persuaded that the $750 limitation on the federal exemption for tools of the trade should apply to cases in which debtors have elected to proceed under state exemption statutes. *See* 11 U.S.C. § 522(d)(6). The dollar cap is really just another way to restrict the term "tools." The plain language of § 522(f)(2)(B) contains no reference to a dollar limitation on the avoidability of liens. 11 U.S.C. § 522(f)(2)(B). Indeed, the two subsections are identical with the exception of the $750 limitation in subsection (d)(6), suggesting that the failure to set a limit on the lien avoidance provision was deliberate. *See In re Thompson,* 867 F.2d 416, 420 (7th Cir.1989) (Bankruptcy Code is carefully, though not infallibly, drafted provision). So long as the tools otherwise qualify for exemption under subsection (b), which includes both state and federal exemptions, they are eligible for lien avoidance as well. 11 U.S.C. § 522(f).

In the instant case, the debtor is entitled to an exemption of at least $30,000 in personalty under the Texas exemption statute, and the value of this property does not cause the debtor to breach that limit. It is clear that the Debtor's equipment comes within the definition of "tools, of the trade of the debtor" as envisioned by subsection (f)(2)(B). Therefore, to the extent that the lien of Sunwest Bank impairs that exemption, the lien can be avoided.

The court of course appreciates the potential adverse impact on nonpurchase-money financing if the "little resale value" limitation is not applied to lien avoidance under § 522(f)(2)(B). However, as noted by

those courts which have refused to graft a limitation onto (f)(2)(B), it is not the function of this court to question why Congress has chosen to permit debtors to avoid the particular liens enumerated in subsection (f), nor can this court repair the provision by fashioning a "federal definition" of the term "tools, of the trade of the debtor" simply to avoid an unfortunate economic result. *See e.g., In re Thompson,* 867 F.2d at 421; *In re LaFond,* 791 F.2d at 627; *Augustine,* 675 F.2d at 586.[7] Whether or not the effect on lending institutions is so severe as to outweigh the value of providing a fresh start to the debtor is not for this court to decide. *See In re LaFond,* 791 F.2d at 627. This court agrees with Judge Posner's observation in *In re Thompson* that, while lending institutions "may be right to grouse about section 522(f) ... [they are] grousing to the wrong body." *See In re Thompson,* 867 F.2d at 421.

### CONCLUSION

The computer equipment is exempt under the Texas exemption statute (including the various peripherals and software). The debtor may avoid Sunwest Bank's lien thereon. There is no doubt that the Bank did not contemplate such a construction of the Bankruptcy Code at the time the loan was made, so this result is indeed unfortunate. However, this court declines to follow those cases which artificially define "tools, of the trade of the debtor" under (f)(2)(B) solely to avoid such unfortunate results. The plain language and legislative history of the Bankruptcy Code dictate the outcome of this case.

The motion of the debtor is GRANTED.

So ORDERED.

---

7. This court has rejected such "well-meaning foray[s] into judicial legislation" before, noting that the role of a bankruptcy judge is to interpret and apply the statute, not to rewrite it or abandon it in favor of equitable policy arguments. *In re Houston,* 96 B.R. 717 (Bankr. W.D.Tex.1989) (citing *Central Trust Co. v. Official Creditor's Committee of Geiger Enterprises,*

454 U.S. 354, 359–60, 102 S.Ct. 695, 697–98, 70 L.Ed.2d 542 (1982) (per curiam) ("the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms").