**In re TREVARROW LANES, INC., Debtor.**

**In re RFZ, LTD., Debtor.**

**Bankruptcy Nos. 91–20695, 91–21237.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

May 5, 1995.

Dennis M. Haley, for debtor.

Marci B. McIvor, Asst. Atty. Gen., for State of Mich.

Marlene A. Juhasz, Asst. U.S. Atty., for I.R.S.

Donald J. Hutchinson, for Brunswick.

### OPINION REGARDING CONFIRMATION OF DEBTORS' PLANS OF REORGANIZATION

ARTHUR J. SPECTOR, Bankruptcy Judge.

Trevarrow Lanes, Inc. and RFZ, Ltd., related corporations principally owned by Richard Zielinski and Jeanette Van Wagoner, filed voluntary petitions for relief under chapter 11 on May 20 and September 16, 1991, respectively. Trevarrow Lanes is a 36–lane bowling center located at 4501 Van Slyke near three General Motors factories in Flint, Michigan. RFZ is the lessee and operator of the bar and lounges in the bowling center, and owns the liquor license and the liquor inventory. The bowling center, complete with bar and lounges, was purchased in March, 1989.[1] As best as can be determined, the total cost of the center's acquisition and the substantial renovations was about $1.4

---

1. The record is unclear whether the Debtor corporations or their principals purchased the assets. In an adversary proceeding filed by Trevarrow against Terry Groves, Imad Isaac and Brunswick Bowling & Billiards Corp., Trevarrow contended that Groves' and Isaac's security interest in much of the personal property at the bowling center was invalid because it was given by the corporate principals, whereas the assets were in fact owned by Trevarrow. This litigation was never resolved.

million, the source of over one-third of which was the principals themselves.

The Debtors contended that their current financial problems arose when Deutsche Credit reneged on its commitment to provide a $235,000 letter of credit to finance the renovations, contracts for which were already signed. The Debtors had sought to modernize the center before the start of the fall, 1989 bowling season. The loss of the letter of credit, the Debtors maintained, caused disruptions from which they never recovered.

Eventually, the Debtors fell behind in their tax payments, so that by the time the chapter 11's were filed, the Debtors owed substantial sums to the Internal Revenue Service and the State of Michigan, mostly in withholding taxes, the Michigan Employment Security Commission for unemployment taxes, and to the local governments for property taxes. In addition, Trevarrow owed Brunswick Bowling & Billiards Corp. almost $1.5 million, a debt secured by substantially all of its assets, and over $900,000 in general unsecured debt.

In a lengthy written opinion dated July 1, 1992, the Court denied Brunswick's motion for relief from the stay, finding that because the assets secured by its liens were worth $1,102,800, but because tax liens of $38,958.95 primed Brunswick's interest, Brunswick's claim was bifurcated into a secured claim of $1,063,841.05 and an unsecured claim for the balance of $408,654.65. It also concluded that the property was necessary for an effective reorganization which was in prospect in the foreseeable future. Finally, two years and several amendments later, the Debtors filed plans which came on for confirmation over the objections of Brunswick, the Internal Revenue Service and the State of Michigan.

■■■ The Debtors bore the burden of proving by a preponderance of the evidence

that their respective plans satisfy the requirements for confirmation. *In re Briscoe Enters.,* 994 F.2d 1160 (5th Cir.) *cert. denied,* — U.S. —, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Monarch Beach Venture, Ltd.,* 166 B.R. 428 (C.D.Cal.1993); *In re Cellular Information Systems, Inc.,* 171 B.R. 926 (Bankr.S.D.N.Y.1994); *In re Zaleha,* 162 B.R. 309 (Bankr.D.Idaho 1993); *In re Washington Assocs.,* 147 B.R. 827 (E.D.N.Y.1992); *In re Westwood Plaza Apts.,* 147 B.R. 692, 23 B.C.D. 420 (Bankr. E.D.Tex.1992); *In re MCorp Financial, Inc.,* 137 B.R. 219, 26 C.B.C.2d 1805 (Bankr. S.D.Tex.1992); *In re Atlanta Southern Business Park, Ltd.,* 173 B.R. 444, 26 B.C.D. 138 (Bankr.N.D.Ga.1994). Those requirements are set forth in 11 U.S.C. § 1129(a)(1) through (13).[2] But compliance with § 1129(a)(8), which specifies that each class of claims or interests must either be unimpaired or accept the plan, is not mandatory; § 1129(b)(1), the "cramdown" provision, allows for confirmation "notwithstanding the [impaired class' nonacceptance] if the plan does not discriminate unfairly, and is fair and equitable with respect to" that class.

Both Debtors established that their plans satisfy § 1129(a)(1) through (7), § 1129(a)(10), (12), and (13). RFZ also proved that its plan satisfies § 1129(a)(8). With respect to Trevarrow, however, the class comprised of unsecured nonpriority claims (Class IX), which would receive only a 40% dividend and hence is impaired, rejected the plan.[3] Class III, comprised solely of Brunswick's impaired secured claim, likewise rejected the plan. Thus Trevarrow's plan cannot be confirmed unless it meets the criteria set forth in § 1129(b)(1).

Brunswick and the IRS argued that Trevarrow's plan does not meet the requirements of § 1129(b)(1) with respect to secured

---

**2.** Unless the context dictates otherwise, all statutory references are to title 11, United States Code.

**3.** Although most of Trevarrow's creditors holding claims in Class IX that voted accepted the plan, Brunswick cast a rejecting ballot with respect to its large deficiency claim. This rejecting claim

claims and Brunswick argued likewise with respect to unsecured claims. Brunswick also argued that Trevarrow's plan does not satisfy § 1129(a)(11),[4] while the State of Michigan contended that Trevarrow's plan does not satisfy § 1129(a)(9). According to the IRS, neither Trevarrow's nor RFZ's plan satisfies this latter provision. For the reasons which follow, I hold that (1) both plans satisfy § 1129(a)(9); (2) neither plan satisfies § 1129(a)(11); (3) Trevarrow's plan satisfies § 1129(b)(1) with respect to Class III; and (4) Trevarrow's plan does not satisfy § 1129(b)(1) with respect to Class IX. This opinion contains my findings of fact and conclusions of law pursuant to F.R.Bankr.P. 7052 on the contested matter of the confirmation of the plans of reorganization.

## SECTION 1129(a)(9)

■ Unless the claimholder agrees otherwise, a plan must provide for full and immediate payment of administrative claims. § 1129(a)(9)(A). The State of Michigan argued that the plan failed to meet this requirement with respect to its administrative claim. That argument is overruled because the State failed to establish that its claim is entitled to administrative status.

Section 1129(a)(9)(C) requires that a plan provide that holders of tax claims of the type specified in § 507(a)(7) [now recodified as § 507(a)(8)] "receive ... deferred cash payments, over a period not exceeding six years after the date of assessment ..., of a value, as of the effective date of the plan, equal to the allowed amount of such claim." Initially, the State objected to the confirmation of Trevarrow's plan on the ground that the proposed treatment of its tax claim did not comply with this provision. Trevarrow subsequently modified the plan to correct a slight miscalculation regarding payment of that claim. Since the State did not raise the

issue following this amendment, I assume that its objection has been withdrawn.

The IRS also invoked § 1129(a)(9)(C), arguing that Trevarrow's plan understates its tax claim, and that both plans improperly amortize payments on these claims. The basis for the former assertion is the IRS' contention that its claim against Trevarrow for a penalty and interest thereon, amounting to $35,318.33, qualifies as a priority claim under [former] § 507(a)(7).

■ This assertion is consistent with proofs of claim filed by the IRS. Rather than formally objecting to such proofs, as it should have done, Trevarrow chose the indirect method of filing a plan which treats the claim for penalty and interest as a nonpriority claim. In objecting to confirmation of the plan, however, the IRS put the propriety of this treatment squarely at issue, and both parties had ample opportunity to present their argument. Since no harm resulted from the procedural oversight, I will simply disregard it.

■ As for the merits of the IRS' objection, Trevarrow's relegation of the penalty/interest claim to unsecured status is justified. *See In re Suburban Motor Freight,* 36 F.3d 484, 489 (6th Cir.1994). The objection is therefore overruled.

■ The IRS' amortization argument has two components. The first is that the plans violate § 1129(a)(9)(C)'s requirement that payments be made on an equal monthly installment basis. This argument is rejected because that statute imposes no such requirement. *See In re Gregory Boat Co.,* 144 B.R. 361, 23 B.C.D. 651, 27 C.B.C.2d 1430 (Bankr.E.D.Mich.1992) (There is no requirement in § 1129(a)(9)(C) (or anywhere else for that matter) that payments be made in any

---

overwhelmed the acceptances by a large measure.

**4.** Although Brunswick's § 1129(a)(11)–based objection encompasses both plans, it technically relates only to Trevarrow's, as Brunswick is not a creditor of RFZ. This distinction matters little, however, as a court cannot confirm a plan without making a specific finding that it satisfies

§ 1129(a)(11). *In re M & S Assocs., Ltd.,* 138 B.R. 845, 848 (Bankr.W.D.Tex.1992); *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D.Tex.1989); *In re Neff,* 60 B.R. 448, 453 (Bankr.N.D.Tex.1985), *aff'd sub nom., Small Business Admn. v. Neff,* 785 F.2d 1033 (5th Cir. 1986).

particular way, so long as the plan provides for full payment within the time prescribed.); *In re Volle Electric,* 132 B.R. 365, 22 B.C.D. 198 (Bankr.C.D.Ill.1991), *aff'd,* 139 B.R. 451, 22 B.C.D. 1502 (C.D.Ill.1992); *In re Sanders Coal & Trucking,* 129 B.R. 516 (Bankr. E.D.Tenn.1991).

The second component is the IRS' argument that the treatment of its claims in both plans is improper because the plans do not provide the date that payments will commence. This assertion notwithstanding, the plans' amortization schedule for the government's claims makes clear that the payments were to commence in October, 1994.[5] This argument is therefore rejected as well.

■ Finally, the IRS argued that neither plan can be confirmed because the plans do not provide for the Internal Revenue Service to receive "deferred cash payments ... of a value, as of the effective date of the plan, equal to the allowed amount of [its] claim" because the plans provide for interest on the delayed payments at a rate different from the IRS' statutory rate. This objection betrays the government's misunderstanding of the concept of present value.

■ The term "value as of the effective date of the plan" as used in § 1129(a)(9)(C) and other sections of the Bankruptcy Code, "indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan." H.R.Rep. No. 595, 95th Cong., 1st Sess. 408, reprinted in 1978 U.S.C.Cong. and Admin.News 5963, 6364.

A standard bankruptcy treatise explains what a present value analysis entails.

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consid-

er the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

5 *Collier on Bankruptcy,* ¶ 1129.03[4][f][i], at 1129–65 (15th ed. 1987). If the government receives interest at a rate equal to the appropriate discount rate, its aggregate receipts over the payment period will equal the present value of its tax claims. This is what § 1129(a)(9)(C) requires.

*In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503, 1505 (9th Cir. 1987). The IRS suggests that the only correct discount rate to be applied is the rate provided for in 26 U.S.C. § 6621. It cites no authority sustaining this position and persuasive authority exists to the contrary. *Id.*

■ The IRS is technically not entitled to "interest." It is entitled to full payment of its priority unsecured claims. If the Debtors had the ability, they could pay these claims in cash at confirmation. Since they cannot do that, they propose to pay the equivalent of up-front cash. The Debtors claim that 8% "interest" on the delayed payments will make the IRS whole. They provided the testimony of Rondal Trantham and a chart of the current yields on government bonds and notes of various maturities. Exhibit AA. The yield ranged from 6.04% for the earliest assessed tax to 6.22% for the latest (calculated from the month that Trevarrow's chapter 11 case was filed, as the latest taxes had not been assessed when this case was filed). The government provided no contrary evidence. I therefore find that by the Debtors paying the Internal Revenue Service's priority unsecured claims over a period of time with "interest" on the unpaid balance at 8%, the IRS would "receive on account of such claim deferred cash payments ... of a value, as of the effective date of the plan, equal to the allowed amount of such claim." The

---

5. Wisely anticipating a protracted confirmation process, the Debtors included the following provision in their plans: "In the event that confirmation is delayed for any reason, and the period of time available under Section 1129(a)(9) of the Bankruptcy Code for amortizing the unsecured claims of governmental units over six years from

the date of assessment is less than the amount estimated in the treatment described above, then the amount of the monthly payment shall be adjusted so as to amortize the claim over the balance of the period provided under Section 1129(a)(9)...."

Internal Revenue Service's objections are therefore overruled.

## SECTION 1129(a)(11)

 A plan cannot be confirmed unless it is "feasible," which means that "[c]onfirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." § 1129(a)(11). A critical issue in assessing the feasibility of a plan which provides for the debtor's continued operation is whether the debtor can generate "sufficient cash flow to fund and maintain both its operations and obligations under the plan." *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr.S.D.Fla.1993). The "income projections must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic." *In re Sound Radio, Inc.*, 103 B.R. 521, 524 (D.N.J.1989), *aff'd* 908 F.2d 964 (3d Cir.1990); *In re Eastland Partners Ltd. Partnership*, 149 B.R. 105, 108, 23 B.C.D. 1307 (Bankr.E.D.Mich.1992). In making my decision here, I have considered the combined payment obligations, revenues, incomes, and projections for same of both Debtors, as the parties framed their respective arguments in those terms, and the companies' financial operations are closely interrelated.

 The Debtors propose to make payments under the plans for a period of 10 years. These payments would total $251,000 for each of the first three years following confirmation, and $207,000 annually for seven years thereafter.[6] Brunswick vigorously contended that these projections are unrealistic.

In support of this contention, Brunswick pointed out that, since the Debtors first started operating in 1989, they never earned as much net income in any fiscal year as they project they will earn in each of the next 10 years. This glaring discrepancy between facts of the past and predictions for the future is strong evidence that the Debtors' projections are flawed. *See In re Euerle Farms, Inc.*, 861 F.2d 1089, 1091 (8th Cir. 1988); *In re Kuether*, 158 B.R. 151, 154, 29 C.B.C.2d 743 (Bankr.D.N.D.1993); *In re Hirt*, 97 B.R. 981, 983 (Bankr.E.D.Wis.1989); *In re Hobble–Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr.D.Mont.1988).

 Consideration of the Debtors' past efforts at prognostication further undermine their position. The Debtors' earlier plans were accompanied by disclosure statements which contained monthly projections for the (at that time) "upcoming" 1992–93 fiscal year. The Debtors' operations are highly cyclical. Their busy season coincides with those of the bowling leagues, which run from September through the following April—a period of eight months. In the late summer, the lanes are stripped and otherwise prepared for the next league season. Consequently, the Debtors' plans provided for debt repayment predominantly in the months of September through April. Brunswick introduced into evidence the various unapproved disclosure statements and the approved version of Trevarrow's current disclosure statement, from which these projections were obtained. The following table compares the combined financial figures of both Debtors with their corresponding projections.

| Period | Projected Revenues | Actual Revenues | Projected Gross Profit | Actual Gross Profit | Projected Net Profit | Actual Net Profit |
|---|---|---|---|---|---|---|
| 9/92–12/92 | 338,900 | 306,900 | 288,700 | 248,100 | 127,400 | 83,800 |
| 1/93–4/93 | 389,600 | 355,800 | 322,000 | 304,400 | 162,900 | 77,000 |
| 5/93–8/93 | 41,800 | 14,500 | 35,600 | 7,200 | (5,400) | (64,900) |
| 1992–93 | 770,300 | 677,200 | 656,300 | 559,700 | 284,900 | 95,900 |
| 9/93–12/93 | | 304,200 | | 239,100 | | 82,300 |
| 1/94–4/94 | | 319,600 | | 271,100 | | 23,200 |
| 5/94–8/94 | | ~~16,500~~ | | ~~14,700~~ | | ~~(112,700)~~ |
| 1993–94 | 808,800 | ~~640,300~~ | 648,500 | ~~524,900~~ | 260,400 | ~~(7,200)~~ |

---

6. Brunswick asserted in its closing argument that these plan payments must in fact be substantially higher. Because it offered no evidence or adequate explanation for this assertion, I reject it.

| Period | Projected Revenues | Actual Revenues | Projected Gross Profit | Actual Gross Profit | Projected Net Profit | Actual Net Profit |
|---|---|---|---|---|---|---|
| 9/94–12/94 | | ~~314,300~~ | | ~~230,600~~ | | ~~82,900~~ |
| 1/95–4/95 | | ———— | | ———— | | ———— |
| 5/95–8/95 | | ———— | | ———— | | ———— |
| 1994–95 | 788,500 | | 664,700 | | 72,000 | |

Shade indicates use of financial reports filed post-trial to arrive at these figures. The projections for 9/94 and thereafter are taken from Trevarrow's approved Fourth Amended Disclosure Statement; the others are from earlier, unapproved versions.

As can be seen from the table, the Debtors consistently and substantially overestimated their short-term future financial performances. This hardly inspires confidence in the reliability of projections made by the Debtors which extend 10 years down the road.[7]

The Debtors asserted that, per the projections, they need to achieve combined gross revenues of $788,500 the first year after reorganization (which, as Brunswick pointed out, increases 5% each year thereafter). They argued that that figure was attainable because the companies had done that much and more in the past. They noted that in 1989–90 they produced gross revenues of $831,000 and at a lower retail price to patrons than they charge today. In 1990–91, they produced $786,000 in combined gross revenues, also at lower prices. It was only when GM announced large layoffs and plant closings in January, 1992, did the Debtors' revenues take a big hit.

Revenues for 1991–92 should have reflected only some of this bad news. Facing imminent layoff, many patrons might cut back on open bowling or bar patronage, even if they continue in their leagues. But the Debtors produced only $685,000 in gross revenues for that year, a precipitate drop of $101,000. The Debtors did not sufficiently explain this large decrease. One might have expected that 1992–93 revenues would really suffer since GM employees would have then had the option not to join leagues for the new year. However, revenues declined by only about $8,000 in that year. This demonstrates management's poor prognostication skills and why its hindsight explanations for the Debtors' poor results are unconvincing.

In 1993–94,[8] also as we have seen, the Debtors' combined revenues were $640,300, a far, far cry from the $808,800 the Debtors projected in their disclosure statement. The Debtors project that in 1994–95, they will earn combined gross revenues of $849,300. But their previous realities have been so far off the mark from their projections that the Court can have no faith whatsoever in the new projections.[9]

7. The Debtors responded by saying that: "there are . . . no ten year industry projections." P. 5 of Debtors' Brief. "Banks and other financial statements, although commonly entering into long term obligations, do not require financial projections over the life of the loan, but simply look to the borrowers' business history and projections for the next few years." P. 4 of Debtors' Brief. There is no "case which says that to prove feasibility of a long term plan the Debtor must provide projections, supported by expert testimony, for the life of the plan." *Id.*

While the Debtors are correct about the inherent unreliability of long term projections and that courts have nevertheless confirmed long term plans, it is still the Debtors' burden to prove— somehow—that they will be able to perform the obligations they are assuming. If their projections are fundamentally unsound because of unrealistic assumptions, they cannot prevail.

8. The final two months' financial results were not available at the time of the confirmation hearing. But those are the two slowest months of the year, generating almost no revenue. It is therefore simple to just disregard July and August results. But the financial reports were filed in the time this opinion was pending, so an accurate and complete calculation can be made. Since they are the statements of the Debtors and have not been subjected to evidentiary attack by Brunswick, their use against Brunswick (or for the Debtors) would be unfair. But, as stated, the results are essentially irrelevant with respect to revenues, and if weight were to be placed on them at all, it must be seen as prejudicial to the Debtors on net income.

9. As noted in n. 8 *supra,* the Debtors have continued to file their monthly financial reports. For what it is worth, the first four months of the 1994–95 year have been tabulated and show that

More important even than the revenues, are the net profits the Debtors have derived from them. As Brunswick correctly noted, the Debtors' combined net income for the last three years ranged from $130,000 to $147,000, averaging $137,645 per year, much less than the $251,000 required by the plans. Subsequent to the close of the proofs, when the final two months' financial statements were filed, the Debtors' end of year (1993–94) financial results became calculable. As can be seen from the chart on p. 482, the Debtors actually ran a combined loss of approximately $7,200 during the last fiscal year.

During last year's first four-month period, the Debtors earned a net income of $82,300, which is almost identical to the $82,900 they earned in the period of September–December, 1994. Indeed, the first four month period has been amazingly stable over the last three years. (The September–December, 1992 period resulted in combined net profits of $83,800.). This year's net income for that period fits almost exactly in the middle of the range. Given that comparison, one might expect full year results at the end of this year to range from a loss of $7,200 to a net profit of $95,900. Certainly, this analysis lends no support to the Debtors' suggestion that they will earn sufficient net income to pay $251,000 to creditors this year.[10]

It is clear that the Debtors have never come close to achieving the financial results that are required each and every year for the next 10 years. This is strong evidence that the projections are flawed. *See* p. 482, *supra.*

Not content at merely comparing the historical figures with the projections on a macro level, Brunswick also attacked the several assumptions used to arrive at the projected financial results. Through its primary witness, Richard Zielinski, the Debtors maintained that their expenses will be reduced by $45,904 per year due to layoffs of maintenance staff and security personnel and by reducing the variety of the lounges' menu. The expected savings is to come with only a slight ($12,152) corresponding reduction in deli revenue, and no loss of bowling revenue. Yet, as Brunswick correctly noted, the Debtors previously stated that "without adequate maintenance, a high level of customer satisfaction, and the retention of patronage by bowling leagues, the bowling business would not survive." Creditor's Exhibit 11, p. 28 (Trevarrow's Fourth Amended Disclosure Statement).

Brunswick also noted that in the five previous years of their existence, including their years of reorganization, the Debtors failed to attempt such obvious savings. Consequently, it argued, the Court should infer either that such benefits are simply not realizable or that management's failure to implement these changes sooner demonstrates its incompetence. These arguments have merit.

The main assumption attacked by Brunswick was that the bowling center will attract sufficient business to generate the revenue projected by the Debtors. As even the Debtors acknowledged in their disclosure statements, the major contingency affecting the feasibility of the plans is General Motors' future employment levels. The Debtors assume that due to the boom in the automobile industry, GM employment will be maintained at a high level, that a percentage of that greater number of employees are bowlers, and that due to Trevarrow's close proximity

---

the Debtors' combined gross revenues were $314,300 for the period of September–December, 1994. That revenue is only slightly better than the period of two years before and of last year. It certainly would not cause me to reconsider my finding that management's prognostications of future results are not reliable. For example, in Trevarrow's Fourth Amended Disclosure Statement, p. 12, n. 2 and in its counsel's closing arguments, Trevarrow predicted "conservatively" that monthly gross bowling revenue would increase this year by $3,750. When factoring the increased bar revenue, aggregate gross revenue increases were projected to be "$6,075 to $6,750 per month." *Id.* Yet the aggregate gross month-

ly revenues for the September–December period have increased only an average of $2,535 over last year. ($314,300 − 304,200 = 10,100 divided by 4 months = $2,535.)

10. Trevarrow argued, based on the testimony of its accountant, that the industry standard is that bowling establishments earn approximately 35% net income on gross revenues. The Debtors projected their net incomes based on that rule of thumb. However, for whatever reason, the Debtors clearly have not achieved results approaching this supposed industry standard.

to three GM plants, the Debtors will experience a significant increase in business. As shown, Mr. Zielinski's previous projections have been grossly inaccurate even though the auto industry had just begun its recovery. He explained that the anticipated revenue did not occur because the GM employees were required to work long hours of overtime, which left them insufficient time and/or energy to bowl.

But the Debtors were unable to demonstrate that circumstances have changed for the better from their perspective, and that such circumstances are not likely to further change over the next ten years. Nor did the Debtors prove Zielinski's assumption for the cause of his prior inaccurate projections. Finally, management employees of the three GM plants, called by Brunswick, testified at length about their past, present and future employment levels, hours of employment, shifts, etc. Suffice it to say that the evidence did not support the Debtors' expectations for future employment at these GM plants.

The Debtors purport to believe that they are riding on the deck of an ocean liner, S.S. General Motors, when in truth they are strapped to the back of a porpoise. While GM's sales, profits and employment are all up at the present time, the automobile industry is a classic cyclical industry, whose sales, profits and employment levels are bound to dive sometime in the future. Over the period of ten years, this cycle can be expected to occur more than once.[11]

Other than the reference to negative amortization, the court's summary of its decision in *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 394–95 (Bankr.W.D.Tenn.1991) could summarize my decision just as well.

> [F]easibility involves the question of emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success.... This debtor has failed to meet its prior projections and its hopes for success are based upon all things working favorably for the debtor. Unfortunately, many economic factors are out of the debtor's control. Historically and economically, there is insufficient foundation for the debtor's assertion that it can meet its plan projections and payments. The Court more easily could accept the debtor's optimistic projections if the debtor was injecting significant new capital, if the debtor was assuming some of the risks of failure and/or if this was a shorter term negative amortization plan.

(Citations omitted).

"Confirmation depends on a conclusion that the reorganized firm is likely to succeed...." *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir.1990). The Debtors failed to satisfy

---

11. As stated in a recent newspaper article:

> ... Salomon Brothers, Inc. economist David Hensley said that differences in regional economic fortunes will play a dominant role in determining where and when the next economic recession will begin.
>
> "We don't have signs of outright slowdown yet," said Mr. Hensley, "but certain regions are approaching their peaks."
>
> As Mr. Hensley sees it, different parts of the country will peak sequentially, likely starting with fast-growing states located in the center of the country.
>
> . . . . .
>
> Tightening labor markets, which can prompt higher costs and diminish competitive advantages compared with neighboring regions, will slow the booming states, especially the industrial states whose businesses are most vulnerable to rising interest rates.
>
> Topping what might be called the "peaking watch" list are a dozen midwestern states, whose fortunes have zoomed and where unemployment now ranges from 2.9% in Nebraska to 5.7% in Michigan. All are below the 5.9% national average. Flush with demand for consumer durables such as automobiles ... many Midwest factories are operating close to capacity.
>
> Here, said Mr. Hensley, is the potential "flash point." Through must of the Midwest, he said, "there's a race between labor shortages and wage pressures on one hand and the Federal Reserve Board's broad efforts to cool inflation with higher interest rates on the other."
>
> Other economists share Mr. Hensley's concern.

"The Rise and Fall of Nation's Regions May Best Predict Growth, Analysts Say", *Wall Street Journal*, October 31, 1994, pp. A2, A4. It is not improbable that the peak of auto sales, and therefore employment levels, has already passed. *See* "No Rebate on That New Car? Just Wait a Month," *Wall Street Journal*, February 1, 1995, p. B1 ("[T]he deals are another sign of the end of a three-year U.S. auto boom. The automotive market is turning.... You can see the sweaty palms out there.' ").

me that they are likely to succeed if their plans are confirmed. Therefore, despite the Debtors' rosy projections about additional revenues and more efficient operations, I find that they will be unable to achieve the bottom-line net income each and every year necessary to service the debt in the manner proposed in their plans. I conclude that they have failed to carry their burden to show that confirmation of their plans is not likely to be followed by liquidation or the need for further financial reorganization, and therefore also conclude that their plans may not be confirmed.

### CRAMDOWN OF SECURED CLASS—§ 1129(b)(2)(A)

To be confirmed over the rejection of a class of impaired secured claims, a plan must provide that each creditor within that class "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in [the] property" securing the claim. § 1129(b)(2)(A)(i)(II).[12] Brunswick argued that the payments which it would receive under Trevarrow's plan fail this test. In addressing this argument, I must first ascertain the amount of Brunswick's secured claim and then decide whether the stream of payments Trevarrow proposes to pay Brunswick, reduced to present value, equals the amount of that claim.

■ A creditor's "allowed claim ... is a secured claim to the extent of the value of [the] creditor's interest in the estate's interest in [the] property" serving as collateral. § 506(a). The effect of § 506(a) is to "bifurcate[ ] the allowed claim of a creditor holding a lien into an allowed secured claim ... and an allowed unsecured claim," based on the value of the property subject to the lien. *In re Jones,* 152 B.R. 155, 162 (Bankr.E.D.Mich. 1993).

In connection with Brunswick's motion for relief from the stay, the Court found in 1992 that the value of Brunswick's collateral was $1,063,841.05. This meant that, by operation of § 506(a), Brunswick held a secured claim of $1,063,841.05, while the balance of its total claim of nearly $1.5 million claim was deemed unsecured.

Although its motion to lift the stay was denied, Brunswick did receive "adequate protection" payments from Trevarrow during the pendency of the case to "offset any decline in value of the depreciable components" of Brunswick's collateral. Trevarrow's Offer of Adequate Protection, Docket # 45 (dated May 8, 1992). *See* § 363(e). Under the terms of Trevarrow's plan, these pre-confirmation payments, which totaled $120,814, would be applied to Brunswick's secured claim, thereby reducing that claim to $943,027.05. One could argue that such payments should instead be allocated to Brunswick's post-bifurcation unsecured claim. *See, e.g., In re Kain,* 86 B.R. 506, 515, 17 B.C.D. 816, 18 C.B.C.2d 1236 (Bankr.W.D.Mich.1988) ("When an *undersecured* creditor receives proceeds from the sale of it collateral during the pendency of a case, whether or not denominated as adequate protection payments, ... the unsecured portion of the creditor's claim will be reduced ... and the secured portion ... will be determined *exclusive* of such payments."). *But see, e.g., In re Spacek,* 112 B.R. 162, 165 (Bankr.W.D.Tex.1990) ("[S]ince the value of the collateral has not decreased during the case, the adequate protection payments ... must be applied against the secured portion of Bank's indebtedness.").

I need not decide that issue, however, as Brunswick implicitly accepted Trevarrow's assertion that it has a secured claim of $943,027.05. Thus I conclude that, as of the date of the confirmation hearing, Brunswick held a secured claim in that amount.

■ Trevarrow's plan provides for Brunswick to retain the lien securing this claim and for a cash payment to Brunswick

---

12. In lieu of this requirement, the plan can make provision for the sale of the creditors' collateral under the terms specified in § 1129(b)(2)(A)(ii) or, pursuant to § 1129(b)(2)(A)(iii), give creditors "the indubitable equivalent of [their] claims." Trevarrow pursued neither of these alternatives in formulating its plan.

of $77,800 on the plan's effective date.[13] The balance of the debt would be amortized over 10 years at 9.5% annual interest, with payments of $18,105.20 per month each December through May, and $12,534.37 each October and November. No payments would be made from June through September. Brunswick challenged this treatment on the ground that the 9.5% interest rate is too low.

In support of this argument, Brunswick noted the Sixth Circuit's instruction that the plan's interest rate must be "the current market rate" that lenders would charge the debtor if the latter were to seek a loan on the same terms as the crammed-down secured creditor is, in a sense, obliged to make under the terms of the plan. *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982) (chapter 13). According to Brunswick, 9.5% is substantially below the going "market rate."

■ Brunswick arrived at this conclusion based on two 1989 loans to Trevarrow. One was a $50,000 loan secured by a second mortgage on Trevarrow's real estate, Debtor's Exhibit N, and the other was a $150,00 loan secured by a mortgage on Mr. Zielinski's home. *See* Proof of Claim # 25. Both obligations were to be repaid at 22% *per annum.* This evidence as to the current market rate is not compelling, as the loans were made five years ago, when interest rate were far higher than in mid–1994. Moreover, the loan for which Trevarrow gave a second mortgage on its real estate was for all intents and purposes unsecured because the first mortgage was undersecured.

More probative is the interest rate that Brunswick itself charged Trevarrow in the past. *See United States v. Arnold,* 878 F.2d 925, 930 (6th Cir.1989) (a chapter 12 cramdown in which the court stated that the "creditor is entitled to receive *its* current market rate on the 'new loan'" (emphasis added)). In July, 1989, Brunswick's predecessor loaned Trevarrow $1,389,199.06 at 12% interest. *See* Brunswick's Proof of Claim # 18. In November, 1989, Brunswick

loaned Trevarrow another $100,000 at an interest rate of 12%. *See* Brunswick's Amended Proof of Claim # 18. These loans were made in 1989 when interest rates were much higher. But one can compensate for this factor by comparing the interest rate to the then prevailing prime rate of interest. In light of Mr. Trantham's testimony regarding the prime lending rate at the various times in question, it can be seen that the first and second loans were made at 1.42% and 1.5% over prime, respectively, whereas Brunswick's forced "loan" under the plan is 2.25% over prime. This contradicts Brunswick's contention that plan's interest rate is less than it would charge Trevarrow in an arm's-length lending transaction. Because I conclude that Trevarrow's evidence establishes that 9.5% is an appropriate discount rate, Brunswick's objection is overruled.

Another prerequisite to confirmation over the rejection of a class of secured and impaired claims is that the plan provide that each creditor within that class retain the lien securing its claim. § 1129(b)(2)(A)(i)(I). The IRS cited this requirement in objecting to Trevarrow's plan.

In failing to make provision for retention of the IRS's lien, Trevarrow was presumably operating on the assumption that the IRS does not have a secured claim. And at first glance, this assumption appears to be clearly justified, inasmuch as the IRS conceded that its lien is subordinate to that of Brunswick, and all parties conceded that Brunswick's total allowed claim is greater than the value of the collateral. *See, e.g., Jones,* 152 B.R. at 171 n. 21 (Where senior liens exceed the value of the collateral, a creditor's nominally secured claim is deemed totally unsecured by virtue of § 506(a)).

As discussed, however, Brunswick implicitly stipulated that it now holds a secured claim in the amount of $943,027.05. And if one accepts (as I do not) Trevarrow's own estimation, the property which is subject to the IRS' junior lien was worth $1,000,000 as

---

**13.** The Debtor's stated purpose for this payment was to establish the justification for a 9.5% annual interest rate to Brunswick. By paying $77,800 down, Trevarrow computed that Brunswick's indebtedness would be reduced to a figure which would result in a standard 80% loan to value ratio.

of the date of the confirmation hearing,[14] thus leaving roughly $57,000 in "equity" to which the IRS lien arguably attaches.

Since this equity was created by Trevarrow's adequate protection payments to Brunswick, the question of whether the IRS has a secured claim may boil down to essentially the same issue mentioned earlier concerning the proper allocation of such payments. Unfortunately, however, neither Trevarrow nor the IRS explicitly raised the issue, let alone presented arguments to support their respective positions. Because the issue was not briefed, and because its resolution will have no impact on the ultimate disposition of this case, I abstain from deciding the merits of this part of the IRS' objection. *Cf. Ladner v. United States,* 358 U.S. 169, 173, 79 S.Ct. 209, 211, 3 L.Ed.2d 199 (1958) (deferring consideration of an "important and complex [question until it is] ... adequately briefed and argued," rather than addressing the question on the basis of the parties' "meager argument"); *In re Campbell,* 58 B.R. 506 (Bankr.E.D.Mich.1986).

### CRAMDOWN OF UNSECURED CLASS: § 1129(b)(2)(B)(ii)

■ Brunswick also argued that Trevarrow's plan cannot be confirmed because the class of unsecured creditors without priority (Class IX) rejected it and the Debtor is unable to satisfy the elements for cramdown. The Debtor asserted that the plan could and should be confirmed under § 1129(b).

An otherwise confirmable plan must be confirmed over the objection of an impaired class of claims or interests "if the plan does not discriminate unfairly, and is fair and equitable, with respect to" the objecting class. § 1129(b)(1). To "be fair and equitable ... [w]ith respect to a class of unsecured claims," the plan must either provide for payment to that class in manner specified by § 1129(b)(2)(B)(i), or provide that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." § 1129(b)(2)(B)(ii). Brunswick argued that the plan does not satisfy this latter provision, which is the codification of a pre-Bankruptcy Code principle known as the rule of absolute priority. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988).

Section 1129(b)(2)(B) is clearly applicable to the Trevarrow plan, as it is undisputed that the class comprised of unsecured nonpriority creditors (Class IX), which rejected the plan, would receive only a 40% dividend and hence is impaired. Trevarrow conceded that the plan contains no provision which satisfies § 1129(b)(2)(B)(i). The dispute between the Debtor and Brunswick instead focuses on whether the plan's provision that Richard Zielinski and Jeanette Van Wagoner—who currently hold shares in the Debtor that would be cancelled upon plan confirmation—are to obtain new shares in the post-confirmation Debtor in exchange for payment of $30,000 violates § 1129(b)(2)(B)(ii). For the reasons which follow, I hold that it does, and that the plan therefore cannot be confirmed.

■ The absolute priority rule precludes equity owners from retaining an interest in the reorganized debtor if creditors will not be

---

**14.** At the confirmation hearing, the Debtor argued that the value of Brunswick's interest in the estate's interest in the property had fallen from the $1,063,841.05 found by the Court in 1992, to $1 million. The Debtor and Brunswick agreed that the valuation which occurred in 1992 with reference to Brunswick's first motion for relief from the stay is not binding at the time of confirmation, and pointed to § 506(a)'s injunction that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting [a] ... creditor's interest." *See also In re Atlanta Southern Business Park,* *Ltd.,* 173 B.R. 444, 26 B.C.D. 138 (Bankr. N.D.Ga.1994) (when valuation is for purpose of plan confirmation, value must be determined as of the date the plan is confirmed.) Brunswick's response to Trevarrow's suggestion that the value of its collateral decreased was to assert a claim to a super priority under § 507(b). It objected that the Debtor's plan did not provide enough upfront cash to satisfy that super priority claim and so § 1129(a)(9)(A) precluded its confirmation. Because I find that the value of the bowling center's assets has not changed, no further discussion about whether a super priority arises or is dealt with in the plan is necessary.

fully paid.[15] But it does not prevent "old equity" from *acquiring* such an interest, so long as the acquisition is not wholly or partially "on account of" the pre-existing interest in the debtor. Thus if a shareholder's proposed post-confirmation ownership rights stem solely from that shareholder's payment for those rights, the absolute priority rule is irrelevant: the fact that the would-be "purchaser" of the rights owns shares in the debtor is simply happenstance. *See, e.g., In re U.S. Truck,* 800 F.2d 581, 588 (6th Cir. 1986) (referring to the shareholder's "contribution" as the *"price* for its interest" in the reorganized debtor, and affirming the lower court's finding that acquisition of that interest did not violate § 1129(b)(2)(B)(ii) (emphasis added)); *SM 104,* 160 B.R. at 224–25 (collecting authorities for the proposition that, "when prepetition owners infuse into the reorganized debtor necessary new value ..., the basis of their equity interest ... is not their prepetition ownership interest in the debtor, but rather their payment of new value").

■ For this reason, there is no merit to Brunswick's argument that § 1129(b)(2)(B)(ii) categorically prohibits old equity from owning the post-confirmation debtor.[16] It is clear from even a cursory reading of that statute that the absolute priority rule is directed at the *interest* held by the shareholder, not the shareholder personally. This is consistent with pre-Code statements of the rule. *See, e.g., Kansas City Terminal Ry. v. Central Union Trust,* 271 U.S. 445, 454, 46 S.Ct. 549, 551, 70 L.Ed. 1028 (1926) ("[N]o [foreclosure] proceedings can be rightfully carried to consummation which recognize and preserve any *interest* in

the stockholders without also recognizing and preserving the interests ... of every creditor of the corporation." (emphasis added; citation omitted)); *Northern P. Ry. v. Boyd,* 228 U.S. 482, 505, 33 S.Ct. 554, 560, 57 L.Ed. 931 (1913) ("Any arrangement of the parties by which the subordinate *rights and interests* of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation." (emphasis added; citation omitted)). Thus it has always been the case that the absolute priority rule is implicated only if a shareholder's rights *as a shareholder* are recognized in some fashion even though creditors are not fully paid.

■ On the other hand, the rule is clearly violated if the post-confirmation ownership rights are attributable in whole or in part to the fact that the owner is a former shareholder. One could reasonably infer that such is the case if the amount of the contribution proposed in the reorganization plan is substantially less than the market value of the participation right, unless there is some other plausible explanation for the value/price discrepancy. *See, e.g., Ahlers,* 485 U.S. at 204, 108 S.Ct. at 967 (holding that the promise of future service is not "adequate consideration to escape the absolute priority rule"); *U.S. Truck,* 800 F.2d at 588 (Compliance with the absolute priority rule turns in part on whether the new value constitutes a "fair price" for the shareholder's interest in the reorganized debtor.).

With this consideration in mind, a question which arises in connection with the Debtor's plan is whether the shareholders' $30,000 payment is commensurate with the value of the new stock. But because the plan is more

---

15. Stated more generically and comprehensively, the rule "requires that creditors of a debtor ... receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests ... may share in the assets of the reorganized entity." D. Powlen & A. Wuhrman, *The New Value Exception to the Absolute Priority Rule: Is Ahlers the Beginning of the End?,* 93 Comm.L.J. 303, 303 (Fall, 1988). This discussion focuses exclusively on the rule as it relates to shareholders vis-à-vis creditors of the debtor, as that is the situation presented in this and in most cases where the rule is in issue.

16. And as the Debtor correctly argued, courts in this circuit are bound by *U.S. Truck* to allow old equity to participate in the reorganized debtor under certain conditions. *In re Mother Hubbard, Inc.,* 152 B.R. 189, 191 n. 3 (Bankr.W.D.Mich. 1993); *In re Albrechts Ohio Inns,* 152 B.R. 496, 501 (Bankr.S.D.Ohio 1993); *In re Montgomery Court Apts.,* 141 B.R. 324, 343 (Bankr.S.D.Ohio 1992); *In re Creekside Landing, Ltd.,* 140 B.R. 713, 715 (Bankr.M.D.Tenn.1992); *In re Professional Development Corp.,* 133 B.R. 425, 426 (Bankr.W.D.Tenn.1991); *In re Future Energy Corp.,* 83 B.R. 470, 490 (Bankr.S.D.Ohio 1988).

fundamentally flawed, I will not decide that difficult issue. *See generally In re Potter Material Serv.,* 781 F.2d 99, 104 (7th Cir. 1986) ("The valuation of a corporate debtor is a complex task. . . ."); *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1008, 22 B.C.D. 686, 26 C.B.C.2d 700 (Bankr.D.Mass.1991) (noting the uncertainties of stock valuation in this context).

■ A second and subtler way of skirting the absolute priority rule is to grant shareholders some kind of edge over other parties vis-à-vis acquisition of an ownership interest in the reorganized entity. If, for example, only shareholders are afforded the opportunity to make the requisite contribution in exchange for such an interest, then it generally is safe to assume that this opportunity—and, ultimately, the ownership interest itself—is in recognition of shareholder interests. This "stock warrant," so to speak, offends the principle of absolute priority because it represents something of value—a property interest—that is given to shareholders *qua* shareholders, notwithstanding the fact that creditors are to receive less than full payment on their claims. *See Kham & Nate's Shoes No. 2,* 908 F.2d at 1360; *In re BMW Group I, Ltd.,* 168 B.R. 731, 735 (Bankr. W.D.Okla.1994); *SM 104,* 160 B.R. at 227 n. 45 (collecting cases in support of (and one against) this proposition) [17]; *In re A.V.B.I.,* 143 B.R. 738, 740–41, 23 B.C.D. 449 (Bankr. C.D.Cal.1992).

It is with regard to this consideration that the Debtor's plan comes up short. There is no indication in the record that other parties were offered the chance to make the purchase which Zielinski and Van Wagoner propose to make. That being the case, I infer that they were in substance awarded an exclusive right to purchase shares in the new entities. Since there is no evidence to the contrary, I likewise infer that this property right was, for purposes of § 1129(b)(2)(B)(ii), received by Zielinski and Van Wagoner "on account of" their shareholder interests. Accordingly, I hold that the plans do not comply with § 1129(b)(2)(B).

■ This holding would not end the matter if, as asserted by the Debtor, there in fact exists what has come to be regarded as the "new value exception" to the rule of absolute priority. *See, e.g., Unruh v. Rushville State Bank,* 987 F.2d 1506, 1509–10 (10th Cir.1993) (leaving undecided the question of whether "[t]he new value exception . . . first set forth in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121–22 [60 S.Ct. 1, 10, 84 L.Ed. 110 . . . (1939)] continues to exist" following enactment of the Bankruptcy Code). But whether *Los Angeles Lumber* truly did create an exception to the absolute priority rule deserves close scrutiny.

A pre-Code analogue of § 1129(b) was § 77B(f) of the former Bankruptcy Act, which provided that a plan of reorganization under § 77B could be confirmed if, *inter alia,* "it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders." 11 U.S.C. § 207 (repealed 1938). In construing this provision, the Supreme Court concluded that "[t]he words 'fair and equitable' . . . are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations." *Los Angeles Lumber,* 308 U.S. at 115, 60 S.Ct. at 7. To pass muster in these receivership cases, and hence under § 77B(f)'s "fair and equitable" standard, the plan had to be consistent with the principle that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an

---

**17.** The dissenting case cited in *SM 104* is *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir. 1993), *cert. dismissed as moot,* —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). But even that case did not seriously contest the proposition that a shareholder's exclusive right to purchase may violate the absolute priority rule. Rather, it argued that "[a] proposed reorganization plan may give old equity the exclusive opportunity to purchase stock in exchange for new capital for . . . reasons" other than the fact that they own the debtor. *Id.* at 910. That is at least a theoretical possibility which, as the Ninth Circuit stated, raises "a factual question." *Id.* at 911. I add only that, absent persuasive evidence to the contrary, the natural and appropriate inference to be drawn with respect to a plan that grants existing shareholders a stock warrant or a price for the stock that is set too low is that their ownership of the debtor at least partially accounts for the plan proponent's generosity (particularly when the proponent is the debtor).

insolvent corporation." *Id.* at 120, 60 S.Ct. at 9 (quoting *Kansas City Terminal,* 271 U.S. at 455, 46 S.Ct. at 551–52). This principle was called the "rule of full or absolute priority." *Id.* at 117, 60 S.Ct. at 8.

Drawing again from case law developed in receivership reorganizations, the Court spoke of

> the necessity at times of permitting the inclusion of stockholders on payment of contributions, even though the debtor company was insolvent.... "Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights." ... Especially in [*Kansas City Terminal* ] did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.... [T]o accord "the creditor his full right of priority against the corporate assets" where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

*Id.* at 117, 121–22, 60 S.Ct. at 8, 10 (footnote omitted) (quoting *Kansas City Terminal,* 271 U.S. at 455–56, 46 S.Ct. at 551–52); *see also id.* at 121 n. 15, 60 S.Ct. at 10 n. 15 (There may be "[c]ircumstances ... where the former stockholders are the only or most feasible source of the new capital." (citation omitted)).

Thus *Los Angeles Lumber* laid down conditions which had to be satisfied where old equity proposed to purchase an interest in the reorganized debtor. These conditions can be restated as follows:

(1) the purchase price must be "reasonably equivalent" to the value of the ownership interest to be obtained;

(2) the shareholders must be the only good source for the money; and

(3) the contribution must be "essential" to the success of the undertaking.[18]

The assumption underlying the Court's equivalency requirement appears to have been the same as discussed earlier—namely, that any "price break" received by current shareholders with respect to the purchase of newly issued shares is in recognition of their ownership interest. *See Los Angeles Lumber,* 308 U.S. at 122, 60 S.Ct. at 10 (Allowing old equity to receive new shares for less than "adequate consideration ... would ... [facilitate] evasions of the principle of ... absolute priority."). Similarly, the "only-good-source" requirement was apparently premised on the assumption that current shareholders' exclusive right to purchase new shares is attributable to their status as shareholders. *See supra* p. 490; *cf. Bjolmes Realty,* 134 B.R. at 1008 (suggesting that *Los Angeles Lumber* 's only-good-source condition cannot be satisfied unless the plan proponent has "first explor[ed] other sources, including creditors"). Thus I believe that *Los Angeles Lumber* 's first two conditions add nothing to § 1129(b)(2)(B)(ii); rather, they simply direct the court's attention to ways in which that statute's "on account of" provision might be violated.[19]

---

**18.** The Court's requirement that the contribution be in "money or money's worth" is a refinement of the first condition: if the value of the contribution cannot be determined with an acceptable level of certainty, it is assumed not to be "reasonably equivalent" to the worth of the ownership interest. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 122, 60 S.Ct. 1, 10–11, 84 L.Ed. 110 (1939) (Intangibles such as the shareholders' " 'financial standing and influence in the community' and [their ability to] provide a 'continuity of management' ... are not adequate consideration for issuance of the stock in question.... [T]hey cannot possibly be translated into money's worth reasonably equivalent to the participation accorded the old stockholders.").

**19.** The Court in *Los Angeles Lumber* was not presented with, nor did it address, the question of whether there may be a situation in which compliance with either of these conditions might be excused. That decision, therefore, does not stand for the principle that a plan which fails to satisfy the conditions is conclusively deemed to

The same cannot be said with respect to the third condition, as the essentialness requirement is one which clearly is not dictated by the absolute priority rule. But while it is not subsumed by § 1129(b)(2)(B)(ii), it is equally clear that a finding of essentialness does not obviate the need to comply with that statute: nowhere in *Los Angeles Lumber* is the suggestion made that any of its three conditions provide an alternative to strict adherence to the rule of absolute priority. I therefore concur with the view that *Los Angeles Lumber* did not establish an exception to that rule. *See, e.g. SM 104*, 160 B.R. at 224–25 (collecting authorities); *see also U.S. Truck*, 800 F.2d at 588 (assuming without discussion that *Los Angeles Lumber* retains its vitality under the Code, thus implicitly suggesting that there is no inconsistency between that case and the absolute priority rule).[20]

Because there is no exception to the absolute priority rule, the Debtor's failure to comply with § 1129(b)(2)(B)(ii) is fatal to its confirmation effort. To provide a more complete record in the event of an appeal, however, I consider whether the Debtor must also satisfy what might be called the "new value hurdle"—namely, *Los Angeles Lumber*'s requirement that old equity's contribution be "essential to the success of the undertaking."

The legislative history relating to the Bankruptcy Code sheds little light on the question of *Los Angeles Lumber*'s continued vitality. *See, e.g., In re Bryson Properties, XVIII*, 961 F.2d 496, 504 n. 13 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Bjolmes Realty*, 134 B.R. at 1005. Thus there are two plausible explanations for the Code's silence with respect to that issue. One is that Congress implicitly rejected *Los Angeles Lumber* by failing to incorporate its essentialness requirement into the Code. *See, e.g., Kham & Nate's Shoes*, 908 F.2d at 1361 ("The lan-

guage of the Code strongly suggests that [the new value exception did not survive its enactment], and we are to take this language seriously even when it alters pre-Code practices."); *In re Outlook/Century Ltd.*, 127 B.R. 650, 657, 21 B.C.D. 1125 (Bankr. N.D.Cal.1991) (The fact that "Congress adopted a statutory definition that contains no new value exception ... constitutes strong evidence that Congress intended to eliminate the ... exception...."). The other is that Congress implicitly accepted *Los Angeles Lumber* by failing to explicitly repudiate it. *See, e.g., In re Sovereign Group 1985–27 Ltd.*, 142 B.R. 702, 707–08 (E.D.Pa. 1992) ("Based on the pre-Code establishment and use of the new value exception and the absence of evidence of Congressional intent to alter that pre-Code practice, the court concludes that the new value exception remains valid law.").

■ Given the manner in which § 1129(b) is drafted, however, it is unnecessary to choose between these polar opposites. The list of requirements set forth in § 1129(b)(2) which are essential for a finding that the plan is "fair and equitable" is not exhaustive. *See In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989); *In re Dollar Assocs.*, 172 B.R. 945, 949 (Bankr.N.D.Cal.1994); *In re Montgomery Court Apts.*, 141 B.R. 324, 336 (Bankr.S.D.Ohio 1992); *In re SLC Ltd. V*, 137 B.R. 847, 851, 22 B.C.D. 1081, 26 C.B.C.2d 1347 (Bankr.D.Utah 1992). Thus courts have discretion under that statute to impose additional requirements, either case-specific or generic, before making such a finding. *See D & F Construction*, 865 F.2d at 675 ("A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'").

---

violate the absolute priority rule. As suggested earlier, when a plan gives old equity an exclusive right to purchase shares and/or the right to purchase them for less than what they are worth, the presumption that the right is granted "on account of" the recipient's equity interest should, in theory, be subject to rebuttal. I do not speculate as to how such a presumption might be rebutted, however.

**20.** The widespread belief that *Los Angeles Lumber* established an exception to the rule of absolute priority may be based on the misconception that old equity is barred by that rule from purchasing shares in the reorganized debtor.

■ It is therefore reasonable to infer that *Los Angeles Lumber* was neither rejected nor blessed by Congress: rather, the Code leaves it to the courts to decide whether the "fair-and-equitable" objective is subserved by the *Los Angeles Lumber* condition that the contribution be essential, just as would be true with respect to any other requirements not specifically set forth in § 1129(b)(2).

■ The next question is whether courts in this circuit are bound by *U.S. Truck* to impose an essentialness requirement. In that case, the Sixth Circuit quoted with approval a passage from *Los Angeles Lumber* which describes essentialness as a condition for participation by old equity. *See U.S. Truck*, 800 F.2d at 588. The court also opined that § 1129(b)(2)(B)(ii) "involves looking at the need for the contribution," and defined its task as one of "decid[ing] whether the District Court was clearly erroneous in ... [concluding] that the contribution was ... 'essential.'" *Id.* Thus the Sixth Circuit seems to have endorsed *Los Angeles Lumber*'s requirement that the shareholder's contribution be "essential."

However, the evidence which the court reviewed appears to have been relevant only to the question of whether old equity was paying what the court characterized as a "fair price" for its interest in the reorganized debtor. *See id.* (identifying considerations which suggested "that investment in the reorganized company would be a risky proposition"). Because the evidentiary focus in *U.S. Truck* was on price fairness, and because there was no discussion of evidence having a direct bearing on whether the contribution was "essential,"[21] the inference which I draw is that the Sixth Circuit was in effect using the term "essential" as a shorthand reference to the requirement that the contribution reasonably reflect the value of the interest to be acquired. Therefore *U.S. Truck* should not be construed as obliging lower courts to determine old equity's contribution to be essen-

tial before they can find a plan fair and equitable.

■ I reach the same conclusion with respect to *U.S. Truck*'s suggestion that the contribution must be "substantial." *See id.* The quoted term means that which is "of ample or considerable amount." Random House College Dictionary (rev. ed. 1980). Since size is relative, the determination of whether a contribution is substantial should logically be made with reference to something. And since it seems that *U.S. Truck* was concerned exclusively with price fairness, I infer that that "something" is the value of the stock to be acquired. *See In re U.S. Truck Co.*, 47 B.R. 932, 941–43, 12 B.C.D. 1088 (E.D.Mich.1985), *aff'd* 800 F.2d 581 (6th Cir.1986) (wherein the district court used "the general worth of the debtor's stock" as the standard for deciding whether the contribution was "substantial"); *cf. Potter*, 781 F.2d at 102 (The substantialness "argument[ ] go[es] essentially to [the question of whether the current shareholder's] contribution exceeded the interest he received."); *In re Greystone III Joint Venture*, 102 B.R. 560, 577 (Bankr.W.D.Tex.1989), *aff'd* 127 B.R. 138 (W.D.Tex.1990), *rev'd* 995 F.2d 1274 (5th Cir.1991) (describing "substantiality" as having "two facets," one being that the contribution "must be 'money or money's worth,'" the other that "the participation ... must be commensurate with or reasonably equivalent to the capital infusion"). Thus I believe that substantialness—like essentialness—is simply a term used by the Sixth Circuit to convey the principle that a plan which permits old equity to purchase undervalued shares may violate § 1129(b)(2)(B)(ii).

This interpretation is reinforced by *U.S. Truck*'s implicit reliance on *Los Angeles Lumber* for the proposition that old equity's contribution must be "substantial." *See U.S. Truck*, 800 F.2d at 588. Such reliance is seemingly misplaced because, as others have noted, *Los Angeles Lumber* did not use that term in describing the conditions that old

---

21. The court did note that one witness testified that "in light of all the facts, the contribution was essential." *U.S. Truck*, 800 F.2d at 588. But it appears that the only "facts" which formed the basis for this conclusion were those tending to minimize the value of shares in the post-confirmation debtor.

equity had to satisfy in acquiring equity in the post-confirmation debtor. *See, e.g., SM 104*, 160 B.R. at 206 n. 43; *In re Yasparro*, 100 B.R. 91, 97, 19 B.C.D. 745 (Bankr. M.D.Fla.1989); Charles R. Sterbach, *Absolute Priority and the New Value Exception: A Practitioner's Primer*, 99 Comm.L.J. 176, 190 n. 65 (Summer 1994). The Sixth Circuit's apparent misreading of *Los Angeles Lumber* is explainable if, as I believe, *U.S. Truck* was simply alluding to the Supreme Court's equivalency requirement when it indicated that a contribution must be substantial.[22]

For the reasons stated, I conclude that courts in the Sixth Circuit are free to adopt or reject *Los Angeles Lumber*'s essentialness requirement as they see fit. And an important factor counseling against its adoption is the difficulty inherent to the task of distinguishing that which is essential from that which is not. *Cf.* Sterbach, 99 Comm. L.J. at 189 ("The concept of what is a necessary contribution is vague at best ..., subject to extreme manipulation by the debtors and the courts, and open to substantial abuse by a debtor's old equity holders.").

An even more troubling consideration is that, to the extent the essentialness requirement has any teeth, it tends to work to the detriment of the estate. A simple hypothetical will illustrate how this is so.

Assume the debtor's management is presented with two offers to purchase stock in the reorganized debtor. One is from old equity, which is willing to pay $50,000 for the stock. The other is from outside investors, who offer to pay only $20,000. Except for the purchase price, the terms of the offers are the same. Assume further that, although the proceeds generated from the stock sale would certainly be useful (money is always useful), they are not essential to the reorganization effort.

If plan confirmation necessitated a finding that old equity's contribution is essential,

management would be compelled to formulate a plan based on the outside investors acquiring ownership of the debtor. Thus the estate and its creditors would be precluded from realizing the full value of an equity interest in the post-confirmation debtor.

■ The essentialness requirement's tendency to artificially deflate the value of new shares in the debtor might be justified if the requirement served some countervailing purpose. In this regard, the contention is made that it prevents a "sham sale, [wherein] the excess, unnecessary capital could be returned to the new owners in the form of a dividend, redemption or the like, resulting in the old owners acquiring the new equity for little or nothing," (and on account of their prior ownership) ... in violation of the absolute priority rule." *SM 104*, 160 B.R. at 226.

I agree that the absolute priority rule could be circumvented in the manner described in *SM 104*. But there is a more direct and efficient solution than the one which that court proposed. As indicated earlier, the payment of a contribution in exchange for shares in the reorganized debtor is in substance a purchase transaction. In order to determine whether there is "reasonable equivalency" between the purchase price and the value of the shares purchased in such a transaction, the court must know the purchase price. And to the extent the purchaser in essence reserves the right to a rebate of the purchase price, the stated amount of the contribution is at best speculative and at worst—as *SM 104* suggests—illusory.

The appropriate judicial response to this problem is for the court to focus only on that portion of the contribution which is irrevocably committed to the estate when making the stock value/contribution comparison. This is only sensible because the bankruptcy estate, as the seller in the transaction, is entitled to the full benefit of the funds generated by the sale. The putative purchase price can and should be disregarded insofar as the pro-

**22.** To further confuse matters, the Seventh Circuit recently rendered an opinion which associated the concept of substantialness with *Los Angeles Lumber*'s essentialness requirement, and which mistakenly cited its earlier decision in *Potter* for the proposition that "[t]he requirement that a contribution must be substantial is independent of the rule that a contribution be at least equal to the value of the interest retained." *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir.1992). *See infra* n. 23 and accompanying text (discussing *Snyder* in greater detail).

posed purchaser—whether old equity or some other entity—has the right over the life of the plan to receive distributions from corporate assets in existence at the confirmation. *Cf. Ahlers,* 485 U.S. at 204, 108 S.Ct. at 967 (holding that old equity's "promise of future services" could not satisfy *Los Angeles Lumber*'s reasonable equivalency requirement, based in part on the fact that such a promise is "in all likelihood, unenforceable"). As a practical matter, then, full credence will not be given to the nominal purchase price unless the plan provides that distributions to the new owners can be made only from income generated by the reorganized company in excess of that which is needed to fund the plan. This approach better serves the objective of preventing "sham sales" than does the imposition of a requirement based on the slippery notion of essentialness. I therefore do not believe that *SM 104*'s defense of that requirement is well taken.

■ The Code's mandate that the plan be "fair and equitable" implies that the competition for an equity position in the reorganized debtor should be subject to rules that are as uniform as possible. *Cf. BMW Group,* 168 B.R. at 734–35 (suggesting that the chapter 11 trustee or debtor in possession has an obligation to solicit offers to purchase equity in the reorganized debtor from various sources, without favoring or disfavoring old equity or any other entity). Rather than assuring a relatively level playing field, the essentialness requirement selectively handicaps old equity. Because I see no legitimate purpose for manipulating the parties' bargaining powers in this fashion, I conclude that the Debtor did not have to demonstrate that Zielinski's and Van Wagoner's contribution is essential. *See* Elizabeth Warren, *A Theory of Absolute Priority,* 1991 Ann.Surv.Am.L. 9, n. 79 (Feb. 1992) (questioning whether the essentialness require-

ment is appropriate) (*quoted in BMW Group,* 168 B.R. at 760).

■ But if the Debtor had to prove that the $30,000 contribution was essential, I conclude that it failed to do so. Mr. Zielinski testified to the effect that the $30,000 contribution was needed in August, 1994 to meet anticipated cash-flow needs for the following month. I agree with Brunswick's assertion that these needs were either overstated or manufactured out of whole cloth simply to satisfy the essentialness requirement. The plan does not satisfy *Los Angeles Lumber*'s requirement that the contribution be "essential to the undertaking."

■ Finally, Brunswick cited *In re Snyder,* 967 F.2d 1126 (7th Cir.1992) in support of its contention that confirmation should be denied because the $30,000 new investment is small in comparison to the amount of unsecured debt owed by the Debtor and therefore not "substantial." *Snyder* does indeed take the position that a large "disparity between the contribution and the unsecured debt" establishes grounds for a finding that the plan violates the absolute priority rule. *Id.* at 1132. But that position is not justifiable.

*Snyder* suggested that inquiries into the debt/contribution ratio will prevent old equity from acquiring shares in the reorganized debtor that are based on "[c]ontributions that are merely nominal, or 'gratuitous, token cash infusions.'" *Id.* at 1131 (quoting *Greystone,* 102 B.R. at 575). In effect, *Snyder* asserted that such an inquiry will insure that old equity's contribution is essential and reasonably equivalent to the value of the interest received in exchange. *See id.* (indicating that the inquiry has as its genesis "*Los Angeles Lumber*'s . . . criterion . . . that an infusion of new capital must be necessary to the success of the undertaking").[23]

---

**23.** The Seventh Circuit asserted that the comparison between the amount of the contribution and the amount of the debt was not derived from *Los Angeles Lumber*'s requirement "that a contribution . . . be at least equal to the value of the interest retained." *Snyder,* 967 F.2d at 1131. But that assertion is difficult to reconcile with the court's subsequent suggestion that the comparison helps to assure that old equity will not obtain an interest in the reorganized debtor in exchange for a contribution which is only "nominal" or "token." *See* Random House College Dictionary (rev. ed. 1980) (defining "nominal" as meaning "trifling in comparison with the actual value" received); *id.* (defining "token" as meaning "slight" or "minimal"); *see also In re Greystone III Joint Venture,* 102 B.R. 560, 577 (Bankr. W.D.Tex.1989), *aff'd* 127 B.R. 138 (W.D.Tex. 1990), *rev'd* 995 F.2d 1274 (5th Cir.1991) (explicitly linking "substantiality"—the term used by *Snyder* in reference to the debt/contribution com-

This reasoning is subject to two criticisms. The first is that *Snyder* does not explain—nor is it self-evident—why the debt-to-contribution ratio serves as a reliable test in determining either essentialness or equivalency. In fact, since there would ordinarily be an inverse relationship between the amount of debt owed by a debtor and the value of new shares in that debtor, it seems that *Snyder* has it all wrong with respect to the question of equivalency: rather than suggesting that a contribution is "nominal," one would *expect* to see a relatively small cash infusion offered for ownership of a debtor with a great deal of debt. The other problem with *Snyder* is its assumption that courts must or should make a determination of essentialness. For the reasons explained earlier, I reject that assumption.

In short, *Snyder*'s debt/contribution comparison serves no apparent purpose, and the stated premise for making the comparison—i.e., that old equity's contribution must be essential (or, if · one prefers, "necessary")—is unsound. Thus while Mr. Zielinski's and Ms. Van Wagoner's proposed contribution is small in relation to the amount of unsecured debt owed by the Debtor, I decline to infer from that fact that the Debtor's plan is not fair and equitable.

To summarize, I conclude as follows: (1) Trevarrow's plan does not satisfy the absolute priority rule as codified in § 1129(b)(2)(B)(ii); (2) there is no exception to that rule; and (3) the Debtor did not need to, nor did it, establish that Mr. Zielinski's and Ms. Van Wagoner's proposed contribution is essential to the reorganization effort. Based on the foregoing, I hold that Trevarrow's plan does not satisfy § 1129(b)(2)(B)(ii).

### RECAPITULATION

The Debtors failed to carry their burden of proving that confirmation of the plans is not likely to be followed by liquidation or the need for further reorganization. Trevarrow failed to establish that its plan is fair and equitable to the dissenting class of impaired unsecured claims. Accordingly, the plans will not be confirmed. An appropriate order shall enter.

parison—with *Los Angeles Lumber*'s equivalency requirement).

On the other hand, if substantialness is considered as a separate requirement, one runs into the same impracticality as occurs with respect to essentialness. Since only old equity, but not outsiders, would need to show that a contribution is "substantial," a company might be required to accept an outsider's lesser offer for its new equity.